UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
C.T., *individually, and on behalf of her child*, S.T., *a minor*,

Plaintiffs,

- against -

NORTHPORT-EAST NORTHPORT UNION FREE SCHOOL DISTRICT,

Defendant.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
25-CV-1125 (PKC) (ARL)

PAMELA K. CHEN, United States District Judge:

This is a case under the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. §§ 1400–82.[1] Plaintiffs are S.T., a child with a disability,[2] and C.T., his mother. They argue that their public school district, Defendant Northport-East Northport Union Free School District ("Northport"), did not provide S.T. with the free and appropriate public education to which he is entitled under the IDEA. They seek reimbursement for S.T.'s tuition at a private school that S.T. attended for 9th and 10th grade that they allege better met S.T.'s needs. Having exhausted the state administrative process, which terminated in Northport's favor, Plaintiffs now

[1] The IDEA was reauthorized and amended by the Individuals with Disabilities Education Improvement Act ("IDEIA") in 2004, Pub. L. No. 108-446, 118 Stat. 2647. *See E.M. v. N.Y.C. Dep't of Educ.*, 758 F.3d 442, 445 n.1 (2d Cir. 2014). The Court continues to refer to the statute as amended by its common name, the IDEA. *See, e.g.*, *Bd. of Educ. of Yorktown Cent. Sch. Dist. v. C.S.*, 990 F.3d 152, 155 n.1 (2d Cir. 2021) (doing the same).

[2] While many IDEA cases use the nomenclature of "disabled students/children," the Court uses the person-first nomenclature of "students/children with disabilities," which is consistent with the language Plaintiffs themselves use to describe S.T. (*See* Plaintiffs' Opposition to Defendant's Motion, Dkt. 20-5, at 1 (describing S.T. as a "child with a disability").)

seek review of those proceedings in this Court. The parties have cross-moved for judgment on the state administrative record.[3]

For the reasons that follow, Plaintiffs' motion for judgment on the administrative record is granted, and Northport's cross-motion is denied.

## BACKGROUND

### I. Legal Framework

Under the IDEA, New York State is required to provide a free appropriate public education to "all children with disabilities." *See Mr. P v. W. Hartford Bd. of Educ.*, 885 F.3d 735, 741 (2d Cir. 2018) (quoting 20 U.S.C. § 1412(a)(1)(A)). A free appropriate public education—or "FAPE," for short[4]—must include "'special education and related services' tailored to meet the unique needs of a particular child." *Id.* (quoting *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998)); *accord* 20 U.S.C. § 1401(9).

"To ensure that qualifying children receive a FAPE, a school district must create an individualized education program ('IEP') for each such child." *R.E. v. N.Y.C. Dep't of Educ.*,

---

[3] (*See* Plaintiffs' Motion for Judgment on the Pleadings ("Pls.' Mot."), Dkt. 20; Hinerfeld Declaration Supporting Pls.' Mot. ("Hinerfeld Decl."), Dkt. 20-1; Memorandum Supporting Pls.' Mot. ("Pls.' Mem."), Dkt. 20-2; Defendant's Opposition to Pls.' Mot. ("Def.'s Opp'n"), Dkt. 23; Plaintiffs' Reply Supporting Pls.' Mot. ("Pls.' Reply"), Dkt. 20-3; Defendant's Motion for Judgment on the Pleadings ("Def.'s Mot."), Dkt. 22; Venator Declaration Supporting Def.'s Mot. ("Venator Decl."), Dkt. 22-1; Memorandum Supporting Def.'s Mot. ("Def.'s Mem."), Dkt. 22-4; Plaintiffs' Opposition to Def.'s Mot. ("Pls.' Opp'n"), Dkt. 20-5; Defendant's Reply Supporting Def.'s Mot. ("Def.'s Reply"), Dkt. 22-6.) The administrative record was submitted to the Court under seal. The Court will file this Memorandum & Order on a restricted basis to allow the parties seven (7) days to object to any portion they believe should remain restricted, i.e., redacted. If no such objections are timely filed, the Memorandum & Order will be made public in its entirety.

[4] Due to the large number of acronyms that appear throughout this Memorandum & Order, the Court has included an Appendix that contains a glossary of acronyms. *See M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 223 n.1 (2d Cir. 2012) (doing the same).

694 F.3d 167, 175 (2d Cir. 2012) (first citing 20 U.S.C. § 1414(d); and then citing *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 197 (2d Cir. 2002)). The IEP is "a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Id.* (quoting *D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 507–08 (2d Cir. 2006)); *accord* 20 U.S.C. § 1414(d). To satisfy the requirements of the IDEA and provide the student with a FAPE, the IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017). In New York, local Committees on Special Education ("CSE") are responsible for determining whether a child is entitled to educational services under the IDEA and, if so, developing an IEP. *See* N.Y. Educ. Law § 4402(1)(b)(1); *R.E.*, 694 F.3d at 175. Each child's CSE must include certain school officials, teachers, and the child's parent(s). *See* N.Y. Educ. Law § 4402(1)(b)(1)(a).

A parent who is unsatisfied with the IEP and believes the school district has failed to provide their child with a FAPE "may unilaterally place their child in a private school at their own financial risk and seek tuition reimbursement." *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 135 (2d Cir. 2013) (citing *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 9–10 (1993)). To seek reimbursement, the parent must file an administrative challenge called a Due Process Complaint[5] with the state. *See id.* (citing 20 U.S.C. § 1415(b)(6), (f); N.Y. Educ. Law § 4404(1)). That initiates an administrative review process, which begins with a hearing

[5] Despite its name, a Due Process Complaint under the IDEA is "unrelated to the concept of constitutional due process." *R.E.*, 694 F.3d at 175.

before an Impartial Hearing Officer ("IHO") at the local level. *See* 20 U.S.C. § 1415(b)(6), (f); N.Y. Educ. Law § 4404(1). After conducting a trial-like hearing, the IHO issues findings of fact and a decision based on the record. *See* 20 U.S.C. § 1415(h); N.Y. Comp. Codes R. & Regs. tit. 8, § 200.5(j)(3). Either party may then appeal the IHO's decision to a State Review Officer ("SRO"), who conducts an impartial review of the record and renders a decision either affirming or modifying the IHO's order. *See* N.Y. Educ. Law § 4404(2); 20 U.S.C. § 1415(g)(2). Either party may then bring an action in state or federal court to seek review of the SRO's decision. *See* 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3). The court must then independently review the administrative record, hear additional evidence if requested by the parties, and "grant such relief as the court determines is appropriate" based on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(c).

## II. Factual Background[6]

S.T. is a "kind and resilient" young man who enjoys basketball, playing drums, video games, and Taekwondo. (*See* R. at PE82.) He has been diagnosed with Autism Spectrum Disorder ("Autism"), Russell-Silver syndrome,[7] and Attention Deficit Hyperactivity Disorder ("ADHD"). (*See id.* at I6, PE80–82.) He struggles to "read the room," is unable to remember

[6] The following facts are taken from the administrative record and are undisputed unless otherwise stated. The administrative record is not consecutively paginated; rather, it is Bates-stamped with unique identifiers for each category of document. The Court cites to the page numbers as they appear in the administrative record. Therefore, citations to the administrative record ("R.") are as follows: page numbers prefaced by "SD" refer to the SRO's decision; page numbers prefaced by "I" refer to the IHO's decision; page numbers prefaced by "P" refer to the parties' pleadings before the SRO; page numbers prefaced by "PE" refer to Plaintiffs' exhibits before the SRO; page numbers prefaced by "DE" refer to Northport's exhibits before the SRO; and page references prefaced by "T" refer to the transcripts of the proceedings before the IHO.

[7] Russell-Silver Syndrome is "a rare condition that affects growth beginning in the prenatal period." (R. at PE80.)

peers' names, and presents as "socially naive." (*See id.* at PE81.) He has experienced significant trauma, partially due to bullying from his peers. (*See id.* at PE80–82.)

**A. 2019–20 School Year (6th Grade)**

S.T.'s family moved to the Northport-East Northport Union Free School District in September 2019, shortly before S.T.'s 6th grade year. (*See id.* at I6.) Although Plaintiffs' Complaint alleges that Northport denied S.T. a FAPE only for his 8th, 9th, and 10th grade years, and seeks tuition reimbursement only for his 9th and 10th grade years, the Court includes factual information beginning with S.T.'s 6th grade year as relevant background and context. (*See id.* at I6–10 (IHO decision also recounting facts beginning with S.T.'s 6th grade year).) Additionally, as discussed further *infra*, because S.T.'s IEPs remained largely the same from 6th grade onward, S.T.'s progress and performance in 6th and 7th grade are relevant to the question of whether his 8th, 9th, and 10th grade IEPs reasonably continued to recommend the same educational program.

1. <u>S.T.'s 6th Grade IEP</u>

On September 23, 2019, Northport convened a CSE to evaluate S.T.'s educational needs. (*See id.* at I6, PE28.) The CSE determined that S.T. was eligible for special education under the IDEA as a student with a disability,[8] and therefore developed an IEP for his 6th grade year. (*See generally* PE28–37.) To determine S.T.'s present levels of performance and individual needs, the CSE relied on evaluative information, including reports from his parent(s), his counselor, and previously-administered test results. (*See id.* at PE29–31.) S.T.'s mother, C.T., raised a specific

---

[8] S.T. was not diagnosed with Autism until June 2023. (*See* R. at PE78, PE98.) His disability classification on each of his IEPs is "Other Health Impairment." (*See id.* at PE28, PE39, DE13, DE43, DE60, DE116.) The IEPs all note that S.T. had been diagnosed with ADHD, and his 10th grade IEP additionally notes that he was diagnosed with Autism. (*See id.*)

concern "regarding [S.T.'s] reading level as she believe[d] he [was] below grade level." (*Id.* at PE32.)

The resulting IEP concluded that S.T. "present[ed] with significant delays in attention skills and in socio-emotional development which interfere[d] with [his] participation in the general education curriculum." (*Id.* at PE33.) It noted that S.T. required a "structured environment with clearly defined limits and expectations in order to increase [his] compliance with teacher directives and classroom rules." (*Id.* at PE32.) It also noted that S.T. required a "supportive environment to prevent [him from] feeling overwhelmed by school related responsibilities." (*Id.*) It observed that he "require[d] support to complete independent work" and "require[d] a behavior plan to maintain appropriate behavior." (*Id.*)

For S.T.'s special education programs, the IEP recommended Integrated Co-Teaching Services ("ICT") classes for Math and English/Language Arts ("ELA"). (*See id.* at PE28, PE34–35.) In ICT classes, both a general education and special education teacher are present, and they collaborate to present the curriculum to both general and special education students at the same time. (*See id.* at I14); *see also* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.6(g) (defining ICT as "the provision of specially designed instruction and academic instruction provided to a group of students with disabilities and [students without]"). The IEP recommended Direct Consultant Teacher Services ("DCT") classes for Science and Social Studies. (*See* R. at PE28, PE34–35.) DCT classes provide slightly less support than ICT classes: the class is taught by a general education teacher, and there is a special education teacher present on alternating days to support specific students. (*See id.* at PE34–35, I14); *see also* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(m)(1) (defining DCT as services provided by a certified special education teacher "to a student with a disability in the student's regular education classes" in order "to aid such student

to benefit from the student's regular education classes"). The IEP also included a "Resource Room" program for S.T., which is a small class focused on working on IEP goals and other skills related to areas of need. (*See* R. at PE28, PE34, I18); *see also* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(rr) (defining "resource room program" as "a special education program for a student with a disability . . . who is in need of specialized supplementary instruction in an individual or small group setting for a portion of the school day"). In addition to these special education programs, the IEP also included related services including weekly counseling amounting to two hours per month, a positive reinforcement plan, and regular breaks, and it established annual goals for S.T. in reading, writing, math, and social/emotional/behavioral functioning. (*See* R. at PE33–35.)

2. S.T.'s Performance in 6th Grade at Northport Middle School

Pursuant to the IEP, S.T. attended Northport Middle School for 6th grade. His ICT and DCT classes typically contained around 25 students. (*See id.* at T191–92.) In January 2020, the Northport Middle School building was closed due to environmental concerns, and the 6th graders (including S.T.) were transferred to a different building at Norwood Avenue Elementary School. (*See id.* at T166–67, T303.) Then, in March 2020, the school buildings closed entirely due to the COVID-19 pandemic. (*See id.* at T794–95.) S.T. attended school from home, where he had some classes via video, and other times his teachers would give him an assignment to work on independently with a check-in later. (*See id.*) C.T. testified that S.T. had a hard time with the video format and did not do well. (*Id.*) During one of S.T.'s virtual classes from home, C.T. saw that he was unable to read a simple paragraph out loud. (*Id.* at T786.) She testified that she "immediately" called S.T.'s school counselor and said, "We have a problem. I'm not sure what to do about it." (*Id.* at T786, T771.) According to C.T., the counselor responded that they would

have S.T. tested for reading and potential issues with speech/inability to pronounce words. (*Id.* at T786–87.) No such tests appear in the record for S.T.'s 6th grade year.

S.T. frequently did not submit assignments for his classes, but C.T. testified that his teachers would "drop[]" the assignments from his grade rather than failing him or making him complete them. (*See id.* at T792.)[9] Partially as a result of this, C.T. felt that S.T.'s final grades in 6th grade were "artificially inflated because of what [she] had seen as [S.T.'s] inability to keep up with the coursework [and] his participation level." (*Id.* at T796.)[10] C.T. stated that, in her opinion, S.T. did not make academic progress between March and June 2020 or that any progress was "minimal." (*See id.*)

S.T. took several standardized tests in the fall and winter of his 6th grade year called the Northwest Evaluation Association Assessments ("NWEA"). (*See id.* at PE42, PE65, PE214.) Those tests are scored on a scale called the "RIT scale" that ranges from 100 to 350.[11] An RIT score has the same meaning regardless of the grade or age of the student, making it useful for measuring growth over time.[12] The NWEA are interim tests that are used to measure a student's progress toward meeting state proficiency standards at the end of each school year.[13] In New

---

[9] C.T. became aware that this was happening when S.T. in 7th grade, but she testified that it was happening in 6th grade as well. (*See* R. at T791–92.)

[10] S.T.'s final grades from 6th grade are not included in the administrative record.

[11] *See What is the RIT scale?*, NWEA Connection (Mar. 23, 2026), https://connection.nwea.org/s/article/What-is-the-RIT-scale?language=en_US [https://perma.cc/4Z4V-E3CV].

[12] *See What is the RIT scale?*, *supra*.

[13] *See* NWEA Psychometric Sols., *Linking Study Report: Predicting Performance on the New York State Testing Program (NYSTP) Based on NWEA MAP Growth Scores* 5 (July 2020), https://web.archive.org/web/20240424051759/https://www.nwea.org/uploads/2020/02/NY-

York, the final state proficiency tests are called the New York State Testing Program ("NYSTP") assessments.[14]

In the fall of his 6th grade year, S.T. received RIT scores of 190 in English/Reading[15] and 217 in Math, which were in the 8th and 48th percentiles for his grade level respectively. (*See* R. at PE214.) Then, in the winter,[16] S.T. received RIT scores of 190 in English/Reading (the same as in the fall) and 211 in Math (lower than in the fall), which were in the 5th and 24th percentiles for his grade level respectively. (*See id.* at PE42, PE203, PE214.) Based on these scores, S.T. was not on track to meet state proficiency standards for the year.[17] However, S.T. never took the final NYSTP proficiency tests in the spring of 6th grade, (*see generally id.* at PE214 (making no mention of the NYSTP assessment)), presumably because the New York State Education Department suspended all such tests due to the COVID-19 pandemic.[18]

---

MAP-Growth-Linking-Study-Report-2020-07-22.pdf (explaining that NWEA tests are "interim assessments aligned to state-specific content standards").

[14] *See* NWEA Psychometric Sols., *supra*, at 5 (explaining that the NYSTP tests are "New York State's operational summative assessments aligned to the New York State Learning Standards").

[15] The score is referred to as an "English/Language Arts" score at some places in the record, (*see, e.g.*, R. at PE42), and a "Reading" score elsewhere, (*see, e.g.*, *id.* at PE214). The Court refers to it as an English/Reading score.

[16] The winter test was administered in February 2020, (*see* R. at PE42), which was after the Northport Middle School building closed but before the COVID-19 pandemic.

[17] In fact, a study from the NWEA predicts that a student with S.T.'s scores would have less than a 1% chance of meeting the state's proficiency standards in 6th grade. *See* NWEA Psychometric Sols., *supra*, at 18–21 (English/Reading), 22–24 (Math).

[18] *See* Betty A. Rosa, Chancellor Bd. of Regents, and Shannon Tahoe, Interim State Educ. Comm'r, *Statement Regarding Elementary- and Intermediate-Level State Assessments*, N.Y. State Educ. Dep't (Mar. 20, 2020) (available at https://www.nysed.gov/news/2020/statement-board-regents-chancellor-betty-rosa-and-interim-state-education-commissioner-2 [https://perma.cc/24FW-39Y3]).

### B. 2020–21 School Year (7th Grade)

1. S.T.'s 7th Grade IEP

The CSE convened in April 2020 to develop an IEP for S.T.'s 7th grade year. (*Id.* at I9, PE39–49.) The resulting IEP recommended largely the same special education programs and services that S.T. had received during 6th grade. (*Compare id.* at PE28–37 (6th grade IEP), *with id.* at PE39–49 (7th grade IEP); *see also id.* at I9–10 (summarizing IEP contents).) There were, however, some differences. First, the IEP modified the summary of S.T.'s management needs to remove the statement that he required a behavior plan to maintain appropriate behavior. (*Compare id.* at PE32, *with id.* at PE43–44.) Second, the IEP recommended less counseling than before. (*Compare id.* at PE35 (providing for 30 minutes of counseling once per week), *with id.* at PE46 (providing for 30 minutes of counseling twice per month).) Third, the IEP modified the "supplementary aids and services/program modifications/accommodations" by removing S.T.'s positive reinforcement plan, despite noting that S.T. still required positive behavior interventions and was "very responsive to positive reinforcement." (*See id.* at PE44, PE46.) Fourth, the IEP also added four new items: (1) "[c]heck for [u]nderstanding," which entailed teachers "check[ing] with [S.T.] prior to beginning independent tasks to ensure he understands what is required of him"; (2) "[b]reak down directions/tasks into smaller steps"; (3) "[u]se of [g]raphic [o]rganizers" for writing assignments; and (4) "[s]trategic [s]eating," meaning S.T. would "sit in an area of the classroom that is approved by the teacher to support him to focus on instruction and limit sound distractions." (*See id.* at PE46–47.)[19] Fifth, it changed some of S.T.'s annual

[19] S.T.'s 7th grade IEP kept the 6th grade IEP's provision of "[b]reaks" as a supplementary aid/service/accommodation but with minor modifications. (*Compare* R. at PE35, *with id.* at PE46.) It also re-named one entry from "[m]onitor attention to task[s]" to "[r]efocusing and [r]edirection," but the description remained the same: "[S.T.] will be prompted to stay on the task at hand." (*Compare id.* at PE35, *with id.* at PE46.)

IEP goals (by adding a study skills goal and modifying his goal in math), but other goals remained identical or highly similar (for example, his writing goal is identical and his reading goal is similar). (*Compare id.* at PE33–34, *with id.* at PE44–45.)

2. S.T.'s Performance in 7th Grade at Northport Middle School

For most of 7th grade, S.T.'s classes were conducted in a "hybrid" format with respect to in-person attendance. (*See id.* at T193–95.) While his academic classes contained about 25 students, half would be in the classroom on a given day and the other half would participate in the class remotely (i.e., on their computer from home). (*See id.* at T193–95, T311–12.) As a result, S.T. spent about half of his time at Northport Middle School and the other half learning from home. (*See id.*) C.T. testified that S.T. continued to struggle with the virtual learning environment and often left his video classes. (*See id.* at T794–95.) He also continued to struggle with submitting assignments. (*See id.* at T789–92.) In English, for example, he had eight missing assignments by the end of one grading period. (*See id.* at T791.) C.T. testified that his teacher told her that "they were going to have to drop [the missing assignments]," and that while it impacted S.T.'s grade, it "didn't impact his grade the way it should have for missing eight assignments. He should have failed." (*Id.*)

Midway through the school year, S.T. was enrolled in an additional non-graded, non-credit-bearing general education course called Academic Intervention Services ("AIS") for both Reading and Math. (*See id.* at SD37, DE59); *see also* N.Y. Comp. Codes R. & Regs. tit. 8, § 100.1(g) (defining AIS as "additional instruction which supplements the instruction provided in the general curriculum and assists students in meeting the State learning standards"). As of

December 2020, S.T. was failing[20] his Italian class and was below expectations in Math and English. (*See* R. at DE2.) A group of Northport officials, including the principal, assistant principal, psychologist, counselor, and school social worker, met in a "learning support team" to discuss S.T.'s academic performance. (*See id.* at DE2–3, T117–19.) The learning support team decided to defer the requirement that S.T. participate in a foreign language until the following year, and therefore dropped Italian from S.T.'s curriculum. (*See id.*; *see also id.* at DE59.) The team also decided that S.T. should undergo additional testing to assess his speech and language abilities. (*See id.* at DE2, T260.) That evaluation took place three months later, in March 2021. (*See id.* at DE28–37.) It showed that S.T. had an "overall average core language score" but showed "[w]eakness[es]" in word classes and understanding spoken paragraphs. (*See id.* at DE37, DE44; *see also id.* at DE26 (summarizing that "significant deficits were noted on [these] subtests" and observing that "[t]he commonality in [S.T.'s] deficiencies appears to be related to significant deficits in listening comprehension").)

[20] The record is not entirely clear about what constitutes a failing grade at Northport, but it appears that a grade at or below 60 or 61 falls within the "failing" threshold. (*See* R. at DE59 (showing S.T.'s grade in Italian as a 60 during the first grading period of 7th grade); *id.* at DE26 (Northport document stating that S.T. was "deferred from foreign language due to failures"); *id.* at T214, T264 (agreeing that S.T. failed Italian); *but see id.* at PE17 (Plaintiffs alleging in their initial Due Process Complaint that S.T. "failed" a class "with a final grade of 61"); *id.* at T619 (witness reviewing S.T.'s 8th grade report card, which contained a final grade of 61 in Social Studies, (*see id.* at DE78), and testifying that she saw a "failing grade" in that class).)

S.T. received the following grades in his core 7th grade academic classes:

| | ***Progress Report Comments*** | ***Final Comments*** | ***Period 1*** | ***Period 2*** | ***Period 3*** | ***Period 4*** | ***Final Exam*** | ***Final Grade*** |
|---|---|---|---|---|---|---|---|---|
| ***English*** | - INCONSISTENT EFFORT<br>- MONITOR PARENT PORTAL FOR ACADEMIC PROGRESS<br>- IRRESPONSIBLE USE OF SUPPLIES | - HAS ABILITY TO DO BETTER<br>- INCONSISTENT EFFORT | 65 | 65 | 60 | 75 | -- | 66 |
| ***Italian*** | -- | -- | 60 | -- | -- | -- | -- | -- |
| ***Math*** | - GOOD ACHIEVEMENT<br>- HOMEWORK NEEDS MORE EFFORT<br>- GRADE AVERAGE 85–89 | - GOOD ACHIEVEMENT<br>- ACTIVELY CONTRIBUTES IN CLASS | 65 | 91 | 96 | 91 | 85 | 86 |
| ***Science*** | - MONITOR PARENT PORTAL FOR ACADEMIC PROGRESS<br>- GREATER EFFORT NEEDED<br>- GRADE AVERAGE 70–74 | - DOING A GOOD JOB | 85 | 88 | 75 | 80 | 75 | 81 |
| ***Social Studies*** | - INCONSISTENT PERFORMANCE<br>- INAPPROPRIATE CLASS BEHAVIOR | - GREATER EFFORT NEEDED | 70 | -- | 74 | 74 | 78 | 73 |

(*See id.* at PE185–86, DE59.)

Additionally, in the spring, his teachers filled out "student observation reports" about S.T., which were not shared with his parents. (*See id.* at DE38–42, T796–97.) Among other things, his English and Science teachers both reported that he "always" had a short attention span, "always" demonstrated inconsistent learning, and "rarely" worked to potential. (*See id.* at DE38, DE42.) His Science teacher commented that S.T. "[would] not do work," that getting him to do any work in class was "very difficult," and that he mostly did his work in his Resource Room. (*Id.* at DE38.) His Resource Room teacher reported that S.T. "needs constant redirection

to complete assignments." (*Id.* at DE40.) His Math teacher commented that S.T. had "shown great improvement from the 1st quarter," but "struggles with attention and task completion during remote learning." (*Id.* at DE41.) His English teachers commented that he "struggles with completion of task[s—]in class assignments, homework, projects," and that he "struggles with staying on [his] assigned tab on [the school-issued] [C]hromebook[—]often goes on games during class." (*Id.* at DE42.)

Near the end of the school year, S.T. took an NWEA test in English/Reading. (*See id.* at PE214.) He received a score of 205, which was in the 21st percentile. (*Id.*) While that was higher than his 6th grade score of 190, it was still not on track to meet state proficiency standards.[21] S.T. also took the NYSTP state-wide assessments in ELA[22] and Math. (*See id.* at PE214.) He failed to meet state proficiency standards in either area and was "well below proficient" in ELA. (*See id.* at PE214 (showing 7th grade test results); *id.* at PE67–68 (sample score report from the same tests in 8th grade explaining the difference between the different performance levels).)

### C. 2021–22 School Year (8th Grade)

#### 1. <u>S.T.'s 8th Grade IEP</u>

The CSE convened in March 2021 to develop an IEP for S.T.'s 8th grade year. (*See id.* at DE13.) The resulting IEP was, again, similar to the previous year's. (*Compare id.* at PE39–49 (7th grade IEP), *with id.* at DE13–22 (8th grade IEP).) S.T.'s recommended special education

[21] Data from the NWEA indicates that a student with an RIT score of 205 in the spring of 7th grade would have less than a 1% chance of meeting state proficiency standards in English/Reading that year. *See* NWEA Psychometric Sols., *supra*, at 21.

[22] While the NWEA score is labeled English/Reading, (*see supra* n.15), the corresponding NYSTP score is labeled English Language Arts or ELA.

programs and services for 8th grade were virtually identical to those for 7th grade, including ICT classes in Math and English, DCT classes in Science and Social Studies, Resource Room, and twice-monthly counseling. (*See id.* at PE45–46, DE19; *see also id.* at PE46–47, DE19–20 (showing identical "supplementary aids and services/program modifications/accommodations," including breaks, refocusing and redirection, checking for understanding, breaking down directions/tasks into smaller steps, using graphic organizers, and strategic seating).)

2. Amended 8th Grade IEP

A few days after the March 2021 CSE, Northport conducted the speech-language evaluation of S.T., mentioned above, that had been ordered by the learning support team. (*See id.* at SD3.) The CSE then reconvened in April 2021 to review the results. (*Id.*) The CSE observed that S.T.'s speech-language test indicated "strengths in formulating sentences, recalling sentences[,] and making vocabulary connections," but "[s]ignificant difficulties" with "listen[ing] for details" and "focused listening." (*Id.* at DE54.) The CSE determined that "[l]anguage weaknesses [were] impacting [S.T.'s] performance both academically and within social contexts." (*Id.*) In response, the CSE amended the IEP to add one 30-minute session per week of speech-language therapy in a small group. (*See id.*; *id.* at DE43–53 (amended 8th grade IEP).)

3. S.T.'s Performance in 8th Grade at Northport Middle School

During 8th grade, S.T.'s classes were all live in the classroom rather than hybrid. (*See id.* at T195.) Nonetheless, S.T. continued to struggle with staying focused while using his school-issued Chromebook in class. (*See id.* at T379–80; *see also, e.g.*, *id.* at PE187 (mid-year comment from AIS Reading teacher stating that S.T. "continues to be reminded to stay focused and on task because he often gets distracted or is on his computer when he is supposed to be focused on his work," and that "[d]ue to distractions, he only completes a minimal amount of

work each day").) However, Northport never collected data on what triggered S.T.'s inappropriate Chromebook usage and never discussed the option of not allowing S.T. to use his Chromebook during class. (*See id.* at T236–37.) S.T. also continued to struggle with completing assignments. (*See id.* at T381.) To the extent he completed any assignments, he did so in his Resource Room. (*See id.* at T382.)

S.T. received the following grades in his core 8th grade academic classes:

| | ***Progress Report Comments*** | ***Final Comments*** | ***Period 1*** | ***Period 2*** | ***Period 3*** | ***Period 4*** | ***Final Exam*** | ***Final Grade*** |
|---|---|---|---|---|---|---|---|---|
| ***English*** | - INCONSISTENT EFFORT<br>- MISSING ASSIGNMENTS | - NEEDS TO STAY ON TASK<br>- A PLEASURE TO HAVE IN CLASS | 82 | 70 | 70 | 65 | 88 | 75 |
| ***Spanish*** | - DOING A GOOD JOB<br>- ACTIVELY CONTRIBUTES IN CLASS<br>- PUTS FORTH GENUINE EFFORT | - DOING A GOOD JOB<br>- ACTIVELY CONTRIBUTES IN CLASS | 98 | 98 | 91 | 87 | 79 | 91 |
| ***Math*** | - DOING A GOOD JOB | - INCONSISTENT EFFORT | 87 | 84 | 78 | 75 | 87 | 82 |
| ***Science*** | - SATISFACTORY PERFORMANCE<br>- PROJECT'S [sic] MISSING | - SATISFACTORY PERFORMANCE<br>- MORE EFFORT IS REQUIRED | 75 | 85 | 80 | 68 | 78 | 77 |
| ***Social Studies*** | - HOMEWORK INCOMPLETE<br>- MAKING SATISFACTORY PROGRESS | - A PLEASURE TO HAVE IN CLASS | 63 | 54 | 60 | 69 | 60 | 61 |

(*See id.* at PE188, DE78.) As shown above, with respect to his Social Studies class, S.T. failed or was at the threshold of failing during two of the four grading periods, on his final exam, and for his final grade.[23] His grades in all his other academic classes decreased over the school year.

[23] *See supra* n.20 (explaining that the record is unclear as to the precise cut-off for a failing grade at Northport).

Throughout 8th grade, S.T. took several "Reading Plus" assessments as part of his AIS Reading program. (*See id.* at PE205.) Those assessments showed that his overall reading proficiency was at a 3.3 grade level in September 2021, rose to a 4.3 grade level in January 2022, and then decreased slightly to a 4.2 grade level in May 2022. (*Id.* at PE205, I23–24.) The Reading Plus assessments also gave S.T. sub-scores in the specific areas of reading comprehension and vocabulary. (*See id.* at PE205.) By the end of 8th grade, S.T.'s reading comprehension was at a 4.5 grade level and his vocabulary was at a 7.5 grade level. (*See id.*) Northport never provided C.T. with a copy of the Reading Plus test results, so she did not review them until this litigation was underway. (*See id.* at T803.)

S.T. also took NWEA tests in the fall and winter of 8th grade. (*See id.* at PE214.) In the fall, he received RIT scores of 208 in English/Reading, which was in the 28th percentile, and 226 in Math, which was in the 52nd percentile. (*See id.* at PE203, PE214.) In the winter, his Math score increased to a 233, which was in the 60th percentile, but his English/Reading score dropped to 177, which was in the 1st percentile and even lower than his 6th grade NWEA English/Reading score. (*See id.*) S.T. failed to meet state standards on his end-of-year NYSTP proficiency tests in all subjects tested: ELA, Math, and Science. (*See id.* at PE66–69, I23.)

**D. 2022–23 School Year (9th Grade)**

1. S.T.'s 9th Grade IEP

The CSE convened in February 2022 to develop an IEP for S.T.'s 9th grade year, which was supposed to be at Northport High School. (*See id.* at SD3, DE60.) The resulting IEP recommended ICT classes in Math, Science, Social Studies, and English, as well as counseling amounting to one hour per month and 30 minutes per week of speech-language therapy in a small group. (*Id.* at DE60, DE66–67.) The IEP removed S.T.'s Resource Room, which had been the only small group setting in his academic program. (*See generally id.*) C.T. testified

that she objected to removing S.T.'s Resource Room at the CSE meeting because she felt that S.T. continued to need the support. (*See id.* at T806–07.) Northport explained, via a Prior Written Notice ("PWN") sent to S.T.'s parents after the CSE meeting, that "Resource Room was removed for the upcoming school year, as additional general education supports will provide assistance in writing and math as well as his increased support in science and social studies." (*Id.* at DE72); *see also* 34 C.F.R. § 300.503(a) (explaining that written notice "must be given to the parents of a child with a disability a reasonable time before the public agency . . . [p]roposes to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child; or . . . [r]efuses to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child").

2. S.T.'s Performance in 9th Grade at Winston Preparatory School

At some point prior to S.T. beginning 9th grade, C.T. started looking at private schools because she felt that S.T. was not progressing at Northport. (R. at T812.) Over the summer between 8th and 9th grade, S.T. attended a summer enrichment program at a private school called Winston Preparatory School at their Long Island campus ("Winston Prep"). (*See id.* at SD3, T652, T669–70.) Winston Prep is "a program for students with unique learning and executive functioning needs." (*Id.* at PE79.) Over the summer, S.T. took classes in the subject areas of reading, writing, math, and organization and study skills, as well as a class aimed at improving his executive functioning and self-regulation skills. (*See id.* at PE228–38.)

On August 22, 2022, S.T.'s parents signed an enrollment agreement for S.T. to attend Winston Prep for 9th grade. (*Id.* at PE123–27.) On August 30, 2022, C.T. sent Northport an email stating that she and S.T.'s father were rejecting the IEP for the 2022–23 school year and would be placing S.T. in private school and seeking tuition reimbursement from Northport. (*See id.* at PE76.) They received a response from Northport on or around September 20, 2022,

acknowledging C.T.'s email and offering a new CSE meeting, which C.T. did not request and which did not take place. (*See id.* at SD19 n.12, I24, PE77.)

During the 2022–23 school year at Winston Prep, S.T. was placed in small classes of no more than 12 students. (*See id.* at T694.) He was grouped with students with a similar cognitive profile, including similar "decoding and encoding abilities"[24] and a similar "processing speed." (*Id.* at T669.) Winston Prep's head of school testified that grouping similar students allows the teachers to tailor their methods of instruction and then further differentiate the instruction for each particular student. (*See id.*) S.T. also had a "Focus" class each day, which was a one-on-one class designed specifically to meet his areas of greatest need. (*See id.* at T671–72.)

C.T. was "really happy" with S.T.'s progress at Winston Prep, (*see id.* at T824), and the head of the school testified that S.T. made measurable progress during the school year by learning how to write a five-paragraph essay, asking comprehension questions during class, making inferences, and understanding and discussing a book, none of which he was able to do before, (*see id.* at T676–84). Winston Prep noticed that S.T. was "very distracted with the computer," so the school limited his access and made sure that his computer usage was "very much monitored," which was "very helpful to him being able to successfully complete his work." (*Id.* at T689.) S.T. received the following grades during 9th grade at Winston Prep:

[24] Although the record does not make clear exactly what "decoding" and "encoding" are, the Court infers that decoding is a student's ability to turn printed language to spoken words (i.e., reading out loud), and encoding is a student's ability to turn spoken words into printed language (i.e., hearing a word and then spelling it). (*See, e.g.*, R. at PE70 (worksheet for a teacher to assess decoding/encoding based on whether the student "[m]akes pronunciation errors while reading aloud," "[c]an syllabicate multisyllabic words," and "[d]emonstrates grade-level spelling," among other things).)

| | *Fall* | | *Spring* | | *Final Grade* |
|---|---|---|---|---|---|
| | *Numeric* | *Letter* | *Numeric* | *Letter* | |
| ***Language Skills*** | 86 | B | 86 | B | B |
| ***Literature*** | 90 | A- | 93 | A- | A- |
| ***Math*** | 92 | A- | 92 | A- | A- |
| ***History*** | 81 | B- | 84 | B | B- |
| ***Science*** | 87 | B+ | 89 | B+ | B+ |

(*See id.* at PE164.)

In the summer after 9th grade, Winston Prep administered two standardized tests for S.T.: the "Wechsler Individual Achievement Test, Fourth Edition" and the "Gates-MacGinitie Reading Test, Fourth Edition." (*See id.* at PE160–63.) Those tests showed that S.T. was performing below grade level in some areas—for example, his ability to read a passage out loud correctly (oral reading fluency) was at the 4.5 grade level and his essay composition and sentence writing fluency were at the 4.2 grade level—but also that S.T.'s reading vocabulary was now at the 10.0 grade level and his reading comprehension was at the 8.9 grade level. (*See id.* at PE163.)

Meanwhile, during 9th grade, C.T. hired a private licensed psychologist named Dr. Alyson Skinner to do a comprehensive evaluation of S.T. (*See id.* at T816, PE79–115.) C.T. sought a psychological evaluation for S.T. because she had "ongoing concerns regarding [his] educational, social, emotional, and behavioral development," and because S.T. had experienced "pervasive difficulties within the school setting until commencing attendance at [Winston Prep]." (*See id.* at PE79.) C.T. also believed that the old psychological evaluations conducted by Northport were "stale" and did not show S.T.'s "current levels of performance." (*Id.* at T816.) Dr. Skinner reviewed S.T.'s records, interviewed C.T. and S.T., and administered various cognitive, diagnostic, and academic tests. (*See id.* at PE79, PE97–99.) After spending about 8.5 hours conducting assessments over five different days, Dr. Skinner issued a comprehensive evaluation report. (*See id.* at PE79–115, T603.)

The report continued to endorse S.T.'s ADHD diagnosis and also gave S.T. a first-time diagnosis of Autism. (*See id.* at PE98–99.) Dr. Skinner noted that S.T.'s "intellectual profile was characterized by average range abilities across most domains," (*id.* at PE97), but concluded that S.T.'s "established diagnoses and presentation of symptoms significantly impact his learning needs to an extent that necessitates specialized instruction," (*id.* at PE99). She made a series of educational recommendations, including "a small, structured classroom setting" with "[i]ndividually modified instruction and opportunities for 1:1 assistance," and an educational program with strategies for addressing executive functioning deficits that are "embedded within the broader curriculum." (*See id.* at PE100.) Dr. Skinner later testified that Winston Prep's programming was in line with her educational recommendations for S.T., while the ICT classes at Northport were not. (*See id.* at T556–60, T563.)

### E. 2023–24 School Year (10th Grade)

#### 1. <u>S.T.'s 10th Grade IEP</u>

Although S.T. was enrolled at Winston Prep for 9th grade, C.T. requested that Northport convene a CSE to create an IEP for S.T.'s 10th grade year. (*See id.* at PE78.) The CSE convened in July 2023. (*See id.* at I29, DE116.) The CSE discussed S.T.'s progress at Winston Prep and reviewed Dr. Skinner's evaluation. (*See id.* at T456–464.) The CSE also reviewed a report from a school psychologist at Northport who had observed S.T. in a Winston Prep classroom in May 2023. (*See id.* at T459–61.)

The resulting IEP recommended ICT classes in Math, Science, Social Studies, and English, as well as counseling amounting to two hours per month and 30 minutes of speech-language therapy per week in a small group. (*Id.* at DE116.) The IEP also included a Resource Room class. (*See id.*) The CSE discussed Dr. Skinner's report, including S.T.'s new Autism diagnosis, and Dr. Skinner's recommendation that S.T. be educated in a small, structured

classroom. (*See id.* at I31, T473–4.) However, the CSE ultimately rejected that recommendation and decided to continue recommending ICT classes, which would have had around 25–30 students in each class at Northport High School. (*See id.* at T474.) The CSE reasoned that the other option available at Northport High School—a smaller, "self-contained" class that included only students with disabilities—would be inappropriate for S.T. because the students in that class functioned at a lower cognitive level than S.T. (*See id.* at T162, T468–69, T477–78.)

2. S.T.'s Performance in 10th Grade at Winston Prep

On August 22, 2023, C.T. sent Northport an email stating that she and S.T.'s father believed that Northport was failing to offer S.T. a FAPE for the 2023–24 school year and noted that they hadn't yet received a copy of the IEP from the July 2023 CSE meeting. (*See id.* at PE116.) She again informed Northport that she would be unilaterally placing S.T. at Winston Prep and seeking tuition reimbursement from Northport. (*Id.*)

In 10th grade, Winston Prep moved S.T. into a class of students who were more skilled than the students he was placed with in 9th grade. (*See id.* at T684.) S.T. received the following grades during his first semester of 10th grade:

| | ***Fall*** | |
|---|---|---|
| | *Numeric* | *Letter* |
| ***Language Skills*** | 83 | B- |
| ***Literature*** | 83 | B- |
| ***Math*** | 92 | A- |
| ***History*** | 81 | B- |
| ***Science*** | 88 | B+ |

(*See id.* at PE239.)[25]

[25] The underlying administrative proceedings in this case took place during S.T.'s 10th grade year. The record does not include S.T.'s grades from the second semester of 10th grade.

## III. Procedural History

S.T.'s parents filed a Due Process Complaint on September 12, 2023, alleging that Northport had denied S.T. a free appropriate public education for the 2021–22 (8th grade), 2022–23 (9th grade), and 2023–24 (10th grade) school years. (*See id.* at SD4, I2.) As relevant here, the Due Process Complaint alleges that S.T. was denied a FAPE on the following grounds:

(1) The failure to conduct a Functional Behavioral Assessment ("FBA"), develop a Behavioral Intervention Plan ("BIP"), or otherwise consider positive behavioral interventions to address S.T.'s behaviors that impeded his learning or that of others, (*see id.* at PE21);

(2) The failure to recommend appropriate reading support despite S.T.'s difficulties with reading, and the inadequacy of Northport's AIS services, (*see id.* at PE23–24); and

(3) The substantive inadequacy of the special education, supports, and services offered in the 8th, 9th, and 10th grade IEPs, which they believed were not tailored to his individual needs or "reasonably calculated to enable [S.T.] to make progress appropriate in light of his circumstances," (*see id.* at PE22 (citation omitted)).[26]

They requested reimbursement for S.T.'s 9th and 10th grade Winston Prep tuition, among other things. (*See id.* at PE26.)[27]

### A. IHO Proceedings and Decision

IHO Vanessa M. Gronbach held a hearing spanning six days between December 2023 and April 2024. (*See id.* at I2.) The following witnesses testified for Northport:

(1) Erin Girardin, School Psychologist at Northport Middle School, (*see id.* at T111–283);

---

[26] The Due Process Complaint also alleges a host of other IDEA violations, but the Court does not list them because they are not at issue in the present appeal. (*See generally* R. at PE21–25.)

[27] They also requested that Northport reimburse them for the costs associated with Dr. Skinner's evaluation, pay for additional independent educational evaluations, pay for S.T.'s transportation to and from Winston Prep for 9th and 10th grade, reimburse them for the costs of S.T.'s private cognitive behavioral therapy, and pay for their attorneys' fees and expenses. (*See* R. at PE26.)

(2) Elyse Pellicano, School Counselor at Northport Middle School, (*see id.* at T299–370);

(3) Susan Giancola, Special Education Teacher at Northport Middle School, (*see id.* at T374–437); and

(4) Vanessa Costanzo, School Psychologist at Northport High School, (*see id.* at T452–87).

The following witnesses testified for Plaintiffs:

(1) Dr. Alyson Skinner, Licensed Psychologist, (*see id.* at T501–636);

(2) Keith Oncale, Head of School at Winston Prep, (*see id.* at T644–748); and

(3) Plaintiff C.T. (S.T.'s mother), (*see id.* at T758–832).

On July 30, 2024, the IHO issued her findings of fact and decision. (*See id.* at I1–57.) She found that Northport had failed to provide S.T. with a FAPE for the 2021–22 (8th grade), 2022–23 (9th grade), and 2023–24 (10th grade) school years. (*See id.* at I54.) The IHO's decision was based on her findings that, among other things, Northport had:

(1) failed to provide S.T. with appropriate <u>behavioral support</u> to address his behavioral issues, (*see id.* at I37–38, I42, I44–45)[28];

(2) failed to recommend <u>specialized reading instruction</u> for S.T. or otherwise adequately address his reading deficits, (*see id.* at I39, I41–45); and

(3) continued to recommend essentially the <u>same academic program</u> year after year, including ICT classes[29] and AIS services, despite evidence that S.T. was not making progress or benefitting from that program, (*see id.* at I39, I41–45).

---

[28] Specifically, the IHO observed that S.T.'s IEP for the 2019–20 school year noted that S.T. required a behavior plan to maintain appropriate behavior, but that there was "no evidence that a behavior plan was ever recommended." (R. at I37.) She further noted that the statement regarding a behavior plan was removed from S.T.'s IEP for the 2021–22 (8th grade) school year, and that there "was no evidence to explain why it was removed from that section of the IEP," even though "[t]he record showed that [S.T.] still had deficits" that would have benefited from a behavior plan. (*See id.* at I37–38.)

[29] The IHO noted that Northport put forth no testimony to explain how the ICT classes provided S.T. with any of the supports that the IEP had identified as needed, including "a structured environment with clearly defined limits and expectations; a supportive environment to

The IHO concluded that it was appropriate for S.T.'s parents to unilaterally place him at Winston Prep, and ordered Northport to reimburse S.T.'s parents for his 9th and 10th grade Winston Prep tuition. (*Id.* at I54–55.) She also ordered Northport to conduct comprehensive evaluations of S.T. in reading, occupational therapy, and auditory processing, and to conduct an FBA. (*See id.* at I55.)[30]

**B. SRO Appeal and Decision**

Northport appealed the IHO's decision on September 9, 2024. (*See id.* at SD1, P9.) In an order dated November 6, 2024, SRO Carol H. Hauge sustained the appeal and reversed the IHO's determination that Northport had denied S.T. a FAPE for the school years in question. (*See id.* at SD40.) Specifically, the SRO held, among other things, that:

(1) S.T.'s behavioral issues "did not impede his learning or that of others such that it would necessitate an FBA or BIP," and S.T.'s IEPs adequately addressed his behavioral needs, (*see id.* at SD26);

(2) S.T. did not require specialized reading instruction because he had received AIS Reading services that adequately addressed his reading needs, (*see id.* at SD36–40); and

(3) S.T.'s academic program set forth in the IEPs, including ICT classes, was reasonable because S.T. had demonstrated some progress in a similar program during previous years, (*see id.* at SD26–34).

Because she concluded that Northport had offered S.T. a FAPE for the 8th, 9th, and 10th grade school years, the SRO vacated the relief ordered in the IHO's decision. (*See id.* at SD40.)

---

prevent [S.T.] from feeling overwhelmed; and . . . support to complete independent work." (R. at I43.)

[30] The IHO denied S.T.'s parents' other requests for relief, such as reimbursement for S.T.'s private evaluation, summer enrichment programs, or transportation to school. (*See* R. at I54.)

**C. The Instant Lawsuit**

Plaintiffs filed the instant action appealing the SRO's determination on February 27, 2025. (*See* Compl., Dkt. 1.) They ask the Court to reverse the SRO's decision and reinstate the IHO's decision as well as the relief ordered. (*See id.* at 11–12.) Plaintiffs and Northport have cross-moved for judgment on the state administrative record. (*See* Pls.' Mot., Dkt. 20; Def.'s Mot., Dkt. 22.) Neither party has requested for the Court to receive additional evidence beyond what is contained in the administrative record.

**STANDARD OF REVIEW**

Under the IDEA, federal courts must review the administrative record in full, as well as any additional evidence presented by the parties, and grant appropriate relief based on the preponderance of the evidence. *See* 20 U.S.C. § 1415(i)(2)(C). However, "the provision [in 20 U.S.C. § 1415(i)(2)(C)] that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982). Courts should not simply "rubber stamp" the state administrators' conclusions, *M.W.*, 725 F.3d at 139 (citing *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 240 (2d Cir. 2012)), but "must give 'due weight' to the state proceedings, mindful that [the courts] lack 'the specialized knowledge and experience necessary to resolve . . . questions of educational policy,'" *R.E.*, 694 F.3d at 189 (ellipses in original) (quoting *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 113 (2d Cir. 2007)).

Thus, the standard of review for administrative determinations that implicate or are based on educational policy is "more critical" than clear error, but "falls well short of complete *de novo* review." *M.H.*, 685 F.3d at 244 (quoting *Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1086–87 (1st Cir. 1993)). When determining how much deference to give a particular state administrative

determination, the court's analysis "will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive," such as whether it is "well-reasoned" or "based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *Id.* The degree of deference owed also depends on the nature of the determination: for example, "determinations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures," and "[d]ecisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress." *Id.* (first citing *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005); then citing *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 382 (2d Cir. 2003); and then citing *Walczak*, 142 F.3d at 130). On issues of law, "courts owe no deference to state hearing officers." *Ferreira v. Aviles-Ramos*, 120 F.4th 323, 331 (2d Cir. 2024) (quoting *Bd. of Educ. of Yorktown Cent. Sch. Dist. v. C.S.*, 990 F.3d 152, 165 (2d Cir. 2021)).

When an IHO and SRO reach different conclusions, "reviewing courts are not entitled to adopt the conclusions of either state reviewer according to their own policy preferences or views of the evidence." *M.H.*, 685 F.3d at 246. Instead, the courts "must defer to the reasoned conclusions of the SRO as the final state administrative determination." *Id.* If, however, the SRO's determinations are "insufficiently reasoned to merit that deference," the Court may instead consider the IHO's analysis, "which is also informed by greater educational expertise than that of judges." *Id.*; *see also Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ.*, 760 F.3d 211, 219 (2d Cir. 2014) ("[I]f a court concludes than an SRO's decision is inadequately reasoned, 'a better-reasoned IHO opinion may be considered instead[.]'" (quoting *R.E.*, 694 F.3d at 189)).

## DISCUSSION

To determine whether to grant tuition reimbursement under the IDEA, reviewing officers at the administrative and judicial levels apply a three-pronged test known as the *Burlington/Carter* test. *See Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 368–74 (1985); *Carter*, 510 U.S. at 12–16. The test provides that parents can obtain reimbursement if "'(1) the school district's proposed placement violated the IDEA' by, for example, denying a FAPE to the student because the IEP was inadequate; (2) 'the parents' alternative private placement was appropriate'; and (3) 'equitable considerations favor reimbursement.'" *Ventura de Paulino v. N.Y.C. Dep't of Educ.*, 959 F.3d 519, 526–27 & n.23 (2d Cir. 2020) (first quoting *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 152 (2d Cir. 2014); and then citing *E.M. v. N.Y.C. Dep't of Educ.*, 758 F.3d 442, 451 (2d Cir. 2014)).

Under New York law, Northport bears the burden of proof at the IHO hearing with respect to the first and third prongs, including the burdens of persuasion and production. *See* N.Y. Educ. Law § 4404(1)(c). However, as the Second Circuit has noted, the IDEA itself "is silent on the burden of proof," and "the Supreme Court has interpreted the statute to place the burden of challenging an IEP on the party bringing the challenge." *Reyes*, 760 F.3d at 219 (citing *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57–58 (2005)). "It remains an open question whether states may deviate from the IDEA's default rule, as New York does, by placing the initial burden on the school board." *Id.* (citing *Schaffer*, 546 U.S. at 61–62); *Schaffer*, 546 U.S. at 61–62 (declining to decide the issue). The Second Circuit held in *Reyes* that where, as here, the SRO determines that the IEPs were proper and plaintiffs challenge that determination in court, the deference courts owe to the SRO's determination means that "the burden of demonstrating that the SRO erred is properly understood to fall on the plaintiff[s]." *Id.* (citation modified) (quoting *M.H.*, 685 F.3d at 225 n.3). However, "because the standard here is

preponderance of the evidence," the issue of which party bears the burden of persuasion "is only relevant if the evidence [is] in equipoise," *id.* (quoting *M.H.*, 685 F.3d at 225 n.3), which, as explained *infra*, is not the case here.

## I. *Burlington/Carter* Step One: Denial of FAPE and Adequacy of the IEPs

At the first step of the *Burlington/Carter* test, the Court must determine whether Northport denied S.T. a FAPE or, in other words, whether S.T.'s 8th, 9th, and 10th grade IEPs were defective. "In determining whether an IEP complies with the IDEA, courts make a two-part inquiry that is, first, procedural, and second, substantive." *R.E.*, 694 F.3d at 189–90. The procedural inquiry requires courts to examine "whether the state has complied with the procedures set forth in the IDEA." *Id.* at 190 (quoting *Cerra*, 427 F.3d at 192). Procedural violations may justify reimbursement only if, individually or cumulatively, they "'impeded the child's right to a [FAPE],' 'significantly impeded the parents' opportunity to participate in the decisionmaking process,' or 'caused a deprivation of educational benefits.'" *Id.* (alteration in original) (first quoting 20 U.S.C. § 1415(f)(3)(E)(ii); and then citing *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 172 (2d Cir. 2009)). The substantive inquiry asks whether the state has offered "an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Mr. P*, 885 F.3d at 757 (quoting *Endrew F.*, 580 U.S. at 399). Unlike a procedural violation, a substantive violation "automatically entitles the parents to reimbursement," assuming the other *Burlington/Carter* prongs are met. *See M.W.*, 725 F.3d at 143 (quoting *R.E.*, 694 F.3d at 190).

### A. Procedural Adequacy

The Court first addresses Plaintiffs' argument that S.T.'s IEPs were procedurally inadequate because Northport failed to administer an FBA and create a BIP to address his problem behaviors. (*See* Pls.' Mem., Dkt. 20-2, at 18–23.)

"The IDEA requires a school district to 'consider the use of positive behavioral interventions and supports, and other strategies' to address behavior by a [child with a disability] that 'impedes the child's learning or that of others.'" *T.M.*, 752 F.3d at 169 (quoting 20 U.S.C. § 1414(d)(3)(B)(i)). "New York state regulations go beyond this floor set by the IDEA; they require a school district to conduct a full FBA for a student who exhibits behavior that impedes learning, and to develop a BIP to address that behavior." *Id.* (first citing *M.W.*, 725 F.3d at 139–40; then citing *R.E.*, 694 F.3d at 190; and then citing N.Y. Comp. Codes R. & Regs. tit. 8, §§ 200.4(b)(1)(v), 200.22(b)). An FBA identifies the student's "problem behavior," defines the behavior in "concrete terms," identifies "contextual factors that contribute to the behavior," and formulates "a hypothesis regarding the general conditions under which a behavior usually occurs and the probable consequences that serve to maintain it." *M.W.*, 725 F.3d at 139 (quoting N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(r)). A BIP then sets forth "intervention strategies that include positive behavioral supports and services to address the [problem] behavior" based on the FBA. N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(mmm).

New York regulations specifically require an FBA "for a student whose behavior impedes his or her learning or that of others," along with "other appropriate assessments or evaluations . . . as necessary to ascertain the physical, mental, behavioral[,] and emotional factors which contribute to the suspected disabilities." *Id.* § 200.4(b)(1)(v); *see also id.* § 200.22(a)(1) (noting that an FBA "shall be conducted as required in section 200.4 of this Part"). The regulations require the CSE to consider a BIP when the student's impeding behaviors persist "despite consistently implemented general school-wide or classroom-wide interventions." *Id.* § 200.22(b)(1)(i). Thus, there may be some circumstances in which an FBA is required but a

BIP is not (i.e., if the student's behaviors interfere with learning but are not persistent amidst general interventions).

The failure to conduct an adequate FBA is a "serious procedural violation" of the IDEA because it "may prevent the CSE from obtaining necessary information about the student's behaviors, leading to their being addressed in the IEP inadequately or not at all." *L.O. v. N.Y.C. Dep't of Educ.*, 822 F.3d 95, 123 (2d Cir. 2016) (quoting *R.E.*, 694 F.3d at 190). It also "seriously impairs substantive review of the IEP because courts cannot determine exactly what information an FBA would have yielded and whether that information would be consistent with the student's IEP." *R.E.*, 694 F.3d at 190.

1. S.T.'s Behaviors Impeded His Learning

It is undisputed that Northport never conducted an FBA or created a BIP for S.T. (*See* Def.'s Opp'n, Dkt. 23, at 6–8; R. at SD22–26.) The first question is whether it was required to, or, in other words, whether S.T.'s behaviors impeded his learning or that of others such that an FBA or BIP was necessary.

a) The SRO's Determination that an FBA or BIP Was Unnecessary Does Not Merit Deference

The SRO acknowledged that S.T. "required supports to increase attention, complete assignments, apply his self-advocacy skills, articulate his frustrations, and increase his ability to relate to and interact with peers." (R. at SD26.) Nonetheless, she concluded that S.T.'s "behaviors did not impede his learning or that of others such that it would necessitate an FBA." (*Id.*) The SRO appears to have reached this conclusion based on evidence in the record from S.T.'s 7th and 8th grade years that S.T. was friendly, respectful, cooperative, and generally had a positive demeanor and attitude. (*See generally id.* at SD24–26.) She also noted that several witnesses testified that S.T. had made progress towards his social and behavioral goals, such as

being able to state positive qualities about himself or verbalize strategies to maintain relationships with peers. (*See generally id.*) Finally, she summarized testimony from S.T.'s 8th grade special education teacher, who stated that S.T. had difficulty "staying on task" and "could get distracted when working on the Chromebook if he had access to sites such as YouTube," but that she had helped S.T. with his study skills goal—which was to learn and demonstrate some strategies to pay better attention—and that S.T. had accomplished that goal by the end of the year. (*See id.* at SD25–26; *see also id.* at DE48 (IEP discussing goal to "learn 2 new attention strategies (e.g., how to stay on task) and demonstrate these strategies when completing his class assignments, projects or tests").)

The Court struggles to understand how or why these facts led the SRO to conclude that S.T. did not need an FBA or BIP. Whether S.T. was pleasant to be around, or even whether he made some progress with respect to his study skills by learning new attention strategies, does not answer the question of whether his behaviors interfered with his learning in the first place. S.T.'s progress in learning new attention strategies is only relevant if it eliminated his behavioral problems and made it so that he no longer had behaviors that impeded his learning; but the SRO did not reach that conclusion, nor would the record support such a conclusion. Indeed, as the SRO acknowledged, even the teacher who testified that S.T. made progress with respect to attention skills still testified that S.T. had difficulty "staying on task" and "could get distracted when working on the Chromebook." (*See id.* at SD25–26; *see also id.* at T381, T413 (same teacher testifying that S.T. had issues with completing assignments "in a lot of his classes" throughout 8th grade and agreeing that S.T. was "highly distractible").)[31]

[31] Part of the difficulty the Court faces is that despite the length of the SRO's decision—40 single-spaced pages—its analysis is largely conclusory and therefore difficult for the Court to

The Court also notes that the SRO did not engage with relevant evidence showing that S.T.'s behaviors were interfering with his learning and/or that of others. For example, she did not acknowledge that S.T.'s end-of-year progress report from 7th grade includes a comment from his social studies teacher that says "INAPPROPRIATE CLASS BEHAVIOR." (*Compare id.* at PE186 (7th grade progress report), *with id.* at SD22–26 (SRO decision addressing S.T.'s interfering behaviors but not acknowledging this comment); *see also id.* at PE186 (English teacher stating "IRRESPONSIBLE USE OF SUPPLIES" and AIS Reading teacher stating "DIFFICULTY STAYING ON TASK").) At the very least, the SRO should have considered such evidence when determining whether or not S.T.'s behaviors necessitated an FBA or BIP. *See M.H.*, 685 F.3d at 252 (holding that courts need not defer to an SRO decision that fails to consider "highly significant evidence in the record"); *see also, e.g.*, *S.C. v. Katonah-Lewisboro Cent. Sch. Dist.*, 175 F. Supp. 3d 237, 253–57 (S.D.N.Y. 2016) (finding SRO's decision insufficient to warrant deference where the SRO "did not seriously grapple with" contrary evidence or "explain why such evidence should be discounted or is outweighed by the limited evidence cited in support of [the SRO's] conclusion" (first citing *Scott ex rel. C.S. v. N.Y.C. Dep't of Educ.*, 6 F. Supp. 3d 424, 441–42 (S.D.N.Y. 2014); and then citing *F.O. v. N.Y.C. Dep't of Educ.*, 976 F. Supp. 2d 499, 513–18 (S.D.N.Y. 2013))).

---

review. The decision generally proceeds by setting forth legal standards, reciting the facts from the record at length without reference to the legal standards, and then stating conclusions "based on the above" or "based on the foregoing." (*See, e.g.*, R. at SD22–23 (stating legal standard regarding FBAs and BIPs); *id.* at SD24–26 (reciting facts without reference to legal standard); *id.* at SD26 (stating conclusion "[b]ased on the foregoing").) Absent an analysis of how the law actually applies to the specific facts of this case, the SRO's reasoning is not particularly helpful or persuasive. *See Zayas v. Banks*, No. 24-1076-CV, 2025 WL 1091225, at *3 (2d Cir. Apr. 8, 2025) (summary order) (finding IHO's decision to be inadequately reasoned where it did not "explain the connection among its findings of fact, its assessment of relevant evidence, and its conclusion that [the student] was denied a FAPE").

The Court finds that the SRO's decision is unpersuasive and does not merit deference on this issue. Instead, the Court looks to the IHO's decision, which too is "informed by greater educational expertise" than that of the Court. *See M.H.*, 685 F.3d at 246.

b) <u>The IHO's Determination that S.T.'s Behaviors Interfered with His Learning Is Reinstated</u>

While the IHO decision did not explicitly state that S.T.'s behaviors warranted an FBA or BIP, in reaching the conclusion that Northport had denied S.T. a FAPE based in part on its failure to adequately address S.T.'s behavioral needs, the IHO implicitly found that S.T.'s behaviors interfered with his learning. With respect to S.T.'s 8th grade IEP, the IHO explained that "there is no evidence that a behavior plan was ever recommended" despite S.T.'s need for positive behavior interventions and his "deficits with coping, frustration[,] and managing his emotions." (R. at I37–38.) Similarly, regarding S.T.'s 9th grade IEP, the IHO noted that S.T. continued to have social-emotional deficits regarding frustration and coping but no changes were recommended. (*See id.* at I42.) And again with regard to S.T.'s 10th grade IEP, the IHO noted that S.T. continued to have difficulties paying attention, but the IEP still failed to provide "behavior supports" or "positive reinforcements." (*Id.* at I44.) The IHO's reasoning therefore assumes, without explicitly stating, that S.T.'s behaviors interfered with his learning.

The Court agrees. The record evidence clearly shows that S.T.'s behaviors interfered with his learning, supporting the IHO's conclusion on this issue. S.T.'s 6th, 7th, 8th, 9th, and 10th grade IEPs all recognized that S.T. needed "strategies, including positive behavioral interventions, supports and other strategies[,] to address behaviors that impede[d] [his] learning or that of others." (*See id.* at PE33, PE44, DE47, DE64, DE123.) They all noted that he presented with "delays" in "attentional skills" and "social-emotional development" that "interfere[d] with [his] participation in the general education curriculum." (*See id.*) They all

recognized that his "performance in class can vary at times, depending on his level of frustration and how well he is able to manage his frustration at any given time," and that "[w]hen frustrated, [S.T.] sometimes struggles to cope effectively" and "becomes overly emotional." (*See id.* at PE32, PE43, DE47, DE63, DE122.) They all noted that he "require[d] teacher reinforcement to stay on task," (*see id.* at PE32, PE43, DE47, DE64, DE123), and his 9th and 10th grade IEPs added that S.T. would "engage in task avoidant behaviors," (*see id.* at DE64, DE123). In sum, S.T.'s IEPs themselves leave little doubt that S.T. exhibited behavioral issues that interfered with his learning.

Witness testimony from the impartial hearing before the IHO also supports this conclusion. School psychologist Girardin and school counselor Pellicano both testified that S.T. had issues with distractions and using his school-issued laptop inappropriately throughout middle school. (*See id.* at T154, T234–38, T379–80, T413–14.) Although special education teacher Giancola testified that S.T. was "[w]ell-behaved" in his 8th grade ICT English class and that she did not see any behavioral issues in that class, (*see id.* at T384), the context of her testimony suggests that she meant S.T.'s behaviors did not impede the learning *of others.* In the very next breath, Giancola explained that "staying on task could be difficult" for S.T., (*id.*), which is consistent with the IEPs' indications that S.T.'s distracted behaviors impeded *his own* learning. *See R.E.*, 694 F.3d at 180, 194 (rejecting conclusion that no formal FBA was required based on one teacher's assessment that the student had "no behavior problem[s]" because the record indicated that the student had behaviors that impeded her own learning). Additionally, school counselor Pellicano testified that S.T. engaged in task-avoidance behaviors, such as leaving classes to avoid doing schoolwork, especially English class because "it was a difficult subject." (R. at T342; *see also id.* at T331–32.) She also testified that S.T. would "melt down" or "shut

down" when he became overwhelmed, and gave an example of a time in 6th grade when S.T. left class and went to the nurse's office crying. (*See id.* at T331–34.)

In light of this clear and uncontroverted evidence that S.T.'s behaviors impeded his learning, the Court finds that Northport was required to conduct an FBA at least by S.T.'s 8th grade year, and that the SRO's contrary conclusion was erroneous. *See* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(b)(1)(v); *see also, e.g.*, *Danielle G. v. N.Y.C. Dep't of Educ.*, No. 06-CV-2152 (CBA), 2008 WL 3286579, at *10 (E.D.N.Y. Aug. 7, 2008) (finding FBA required where the student would get "lost in her own thoughts," needed to be "brought back," and would "not necessarily pay[] that much attention" when "things [were] not particularly of interest to her"); *R.K. ex rel. N.Y.C. Dep't of Educ.*, No. 09-CV-4478 (KAM) (RLM), 2011 WL 1131492, at *18 (E.D.N.Y. Jan. 21, 2011) (finding FBA required where the student "was easily distracted and exhibited self-stimulatory behaviors," "need[ed] supervision" and a "structured and supportive environment," and "required adult prompting and support to initiate and follow through with tasks" (citation modified)), *report and recommendation adopted*, 2011 WL 1131522 (E.D.N.Y. Mar. 28, 2011), *aff'd sub nom. R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167 (2d Cir. 2012). And the fact that S.T.'s behaviors persisted year after year strongly suggests that S.T. needed a BIP in addition to an FBA. *See* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.22(b)(1)(i).

2. S.T.'s IEPs Did Not Otherwise Adequately Address His Behavior

As the Second Circuit has made clear, a school district's failure to conduct a required FBA or create a required BIP does not automatically render an IEP inadequate "so long as the IEP adequately identifies [the] student's behavioral impediments and implements strategies to address that behavior." *M.W.*, 725 F.3d at 140 (citing *A.C.*, 553 F.3d at 172). It does, however, "cast doubt on the adequacy" of the IEP's provisions for treating the behavior, *see L.O.*, 822 F.3d at 123, and requires the reviewing court to "take particular care" when assessing the IEP to

ensure that it adequately addresses the student's behavioral issues, *R.E.*, 694 F.3d at 190–91 (citing *A.C.*, 553 F.3d at 172).

a) The SRO's Determination that S.T.'s IEPs Adequately Addressed His Behavioral Needs Does Not Merit Deference

The SRO held that S.T.'s 8th, 9th, and 10th grade IEPs "adequately identified [S.T.'s] needs" and "addressed the areas of concern with program and related service recommendations, goals, supplementary aids and services, program modifications[,] and accommodations." (R. at SD26.) But, as Plaintiffs point out, the SRO's decision did not actually describe strategies or behavioral interventions set forth in the IEPs, nor did it describe how such strategies or interventions addressed S.T.'s unique behavioral needs. (*See* Pls.' Mem., Dkt. 20-2, at 23; *see generally* R. at SD24–26.) The SRO's reasoning seems to have been that because the IEPs in question "provided special education programming and related services" "[t]o address [S.T.'s] behavioral needs," then, *ipso facto*, the IEPs addressed his needs. (*See* R. at SD24–26.) That "conclusory statement does not evince thorough and well-reasoned analysis that would require deference." *M.H.*, 685 F.3d at 249; *see, e.g.*, *id.* (declining to defer to SRO decision that "did no more than state summarily that the [IEP's] goals 'comprehensively addressed the student's needs'").

The only marginally relevant evidence in the SRO's discussion is a summary of Giancola's testimony, which was that Giancola helped address S.T.'s struggles by "provid[ing] supports for [S.T.] in the [ICT English] class as well as the other students in the class," that she "helped him with the attention strategies that he learned" in 8th grade, and that she "talked" with him "about ways to maintain attention and stay on task such as using headphones to block out extraneous noise, or completing a task and then receiving a reward." (*See* R. at SD25–26 (quoting R. at T383–85).) But the SRO did not analyze this testimony or connect it to any

programs or services listed in S.T.'s IEPs. Indeed, there is nothing about using headphones to block noise as a strategy in any of S.T.'s IEPs, and while the IEPs noted that S.T. responded well to positive reinforcement, S.T.'s positive reinforcement plan was removed from his IEPs after 6th grade. (*Compare id.* at PE35 (positive reinforcement plan listed among "supplementary aids and services/program modifications/accommodations" for 6th grade), *with id.* at PE46–47, DE50, DE67–68, DE126–27 (no positive reinforcement plan for 7th, 8th, 9th, or 10th grades).) To the extent the SRO concluded that S.T.'s IEPs were adequate based on Giancola's testimony about services or supports that do not actually appear in the IEPs, that was an error, as the Second Circuit does not permit that sort of retrospective evidence. *See M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 244 (2d Cir. 2015) (explaining that a school district cannot "use retrospective testimony to rehabilitate an otherwise deficient IEP because 'the IEP must be evaluated prospectively as of the time of its drafting'" (quoting *R.E.*, 694 F.3d at 186)).

The Court cannot find that the SRO took the requisite "particular care" in determining whether S.T.'s IEPs adequately addressed his problem behaviors. *See R.E.*, 694 F.3d at 190. Because the Court finds that the SRO's determination was not "well-reasoned" on this point either, the Court again turns to the IHO's decision. *See M.H.*, 685 F.3d at 244.[32]

b) <u>The IHO's Determination that S.T.'s IEPs Did Not Adequately Address His Behavioral Needs Is Reinstated</u>

As noted earlier, the IHO concluded that Northport denied S.T. a FAPE based in part on its failure to address S.T.'s behavioral needs. Although the IHO did not explicitly state that she found this to be a procedural IDEA violation, the Court agrees with the IHO's determination that

[32] Even if the SRO's decision had taken more care to assess the adequacy of S.T.'s IEPs, the Court would still find the SRO's conclusion unsupportable. As set forth next, the Court finds that S.T.'s IEPs were inadequate because they failed to adequately identify S.T.'s behavioral needs, develop strategies to address those needs, or match the strategies to specific behaviors.

S.T.'s IEPs did not adequately address his behavioral issues. It follows, as a result, that Northport's failure to conduct an FBA or implement a BIP constitutes a procedural violation of the IDEA.

The Court recognizes that "whether an IEP adequately addresses a [student with a disability's] behaviors and whether strategies for dealing with those behaviors are appropriate are 'precisely the type of issue[s] upon which the IDEA requires deference to the expertise of the administrative officers.'" *M.W.*, 725 F.3d at 140 (second alteration in original) (quoting *A.C.*, 553 F.3d at 172). The Court is particularly ill-equipped to assess whether the IEPs adequately addressed S.T.'s behavioral needs because the record lacks the information that an FBA would have yielded. *See R.E.*, 694 F.3d at 190 (describing how failure to conduct an FBA "seriously impairs substantive review of the IEP").

Still, without passing judgment on the substance of the IEPs' proposed behavioral interventions, the Court finds, as a procedural matter, that the IEPs did not "adequately identif[y] [S.T.'s] behavioral impediments and implement[] strategies to address that behavior." *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 80 (2d Cir. 2014) (quoting *M.W.*, 725 F.3d at 140). For instance, S.T.'s IEPs included program modifications such as "[b]reaks," "prompt[ing] to stay on the task at hand," and "sit[ting] in an area of the classroom that is approved by the teacher," (*see, e.g.*, R. at DE50), but entirely failed to "match strategies with specific behaviors, instead simply listing behaviors and strategies," *C.F.*, 746 F.3d at 80. That is not enough. *See id.* (holding that, even where the school district did create a BIP, the IEP was still procedurally inadequate where the BIP failed to "adequately create and implement behavioral strategies" by "match[ing] strategies with specific behaviors"). It is also not enough that S.T.'s IEPs contained annual goals for him to improve his attention-related and social-emotional-behavioral skills.

(*See, e.g.*, R. at DE48 (listing "study skills" goal for S.T. to "learn 2 new attention strategies (e.g., how to stay on task)," and "social / emotional / behavioral" goal for S.T. to "verbalize 2 positive strategies to foster and maintain positive relationships with peers").) These goals were divorced from specifically-identified behaviors or needs—and they were not accompanied by any strategy for how Northport would help S.T. achieve them. *See R.K.*, 2011 WL 1131492, at *19 ("IEPs lacking an FBA and BIP must offer adequate equivalent benefits, for example, by . . . detailing a strategy to address the interfering behavior. Merely describing problematic behavior and listing several goals for improvement are not adequate substitutes for the FBA and BIP." (internal citations omitted)).

Furthermore, the record supports the conclusion that S.T.'s IEPs did not "provide functionally equivalent benefits" to those of an FBA. *See id.* at *18. Most importantly, an FBA would have yielded an "identification of the contextual factors that contribute[d] to [S.T.'s] behaviors" and a "hypothesis" as to why the behaviors occurred. *See* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(r). Here, lacking that information or any equivalent guidance from the IEPs, individual teachers and counselors were left to hypothesize about the causes of S.T.'s behaviors on their own. For example, school counselor Pellicano testified that she thought S.T. would leave English class because "it was a long day for [S.T.] and for many ADHD students," because "it takes [them] tremendous energy to focus." (R. at T343.) Thus, she felt that allowing him to leave class "was appropriate." (*Id.*) But just a few moments earlier, she had posited a different hypothesis: that S.T. was engaging in "avoidance because it was a difficult subject." (*Id.* at T342.) In that case, the intervention—allowing S.T. to leave class—may not appropriately address the root cause of the behavior (e.g., his challenges with the academic subject matter). (*See* Pls.' Mem., Dkt. 20-2, at 22–23 (making a similar point).) Similarly, Pellicano testified that

she "wasn't sure of the root cause" of why S.T. would shut down and cry at school. (*See* R. at T334.) She speculated that maybe he would become "overstimulated," or maybe there was a "stressor where it could be academic." (*See id.*) Although the Court cannot judge whether any one of these hypotheses is correct or whether any particular intervention would have been more appropriate, the point is that an FBA would have yielded a more robust hypothesis, based on data rather than (well-intended) conjecture, which would have allowed S.T.'s IEPs to recommend appropriate and consistent interventions in the first instance. *See L.O.*, 822 F.3d at 123 (observing that the failure to conduct an FBA "resulted in the omission of global and specific hypotheses as to why [the student's] problem behaviors occurred" (citation modified) (citing N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(mmm)); *see also, e.g.*, *P.L. v. N.Y.C. Dep't of Educ.*, 56 F. Supp. 3d 147, 161 (E.D.N.Y. 2014) (finding failure to conduct FBA did not rise to level of procedural IDEA violation where the student's IEP included a BIP that "adequately described [the student's] behaviors that interfere with learning, the behavior changes that were expected, strategies to be used to change the behavior[,] and supports that would be employed," and thus contained the information "that typically would be part of an FBA").

While the failure to conduct an FBA or otherwise adequately address S.T.'s behavioral issues is a procedural violation, it is nonetheless a serious one, and one that appears to have substantively impaired S.T.'s academic performance. (*See, e.g.*, R. at DE38 (7th grade Science teacher reporting that S.T. "will not do work"); *id.* at PE187 (8th grade AIS Reading teacher reporting that "[d]ue to distractions, [S.T.] only completes a minimal amount of work each day"); *id.* at DE78 (8th grade English teacher reporting that S.T. "NEEDS TO STAY ON TASK").) Indeed, the record demonstrates that some of S.T.'s "most salient difficulties that impede[d] his educational progress stem[med] from behavioral issues." *See E.H. v. N.Y.C. Dep't*

*of Educ.*, 164 F. Supp. 3d 539, 551 (S.D.N.Y. 2016). The failure to conduct an FBA or create a BIP thus overlaps with the substantive inadequacy of the IEPs, discussed next, and "wrought a uniquely harmful result on [S.T.] in particular." *See id.* The Court therefore concludes that Northport's failure to conduct an FBA or otherwise adequately address S.T.'s behavioral issues in his IEPs denied him a FAPE for the 8th, 9th, and 10th grade school years. *See R.E.*, 694 F.3d at 190; 20 U.S.C. § 1415(f)(3)(E)(ii) (procedural violations may result in the denial of a FAPE if they "caused a deprivation of educational benefits").

**B. Substantive Adequacy**

The Court's inquiry at step one of the *Burlington/Carter* test could end there. But because of the overlap between the procedural and substantive inadequacies in this case, the Court also finds it appropriate to address Plaintiffs' arguments that the IEPs were substantively inadequate.

To be substantively adequate, an IEP must offer "an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Mr. P*, 885 F.3d at 757 (quoting *Endrew F.*, 580 U.S. at 399). The Supreme Court described this standard as "markedly more demanding" than one asking only if the IEP is calculated to enable *some* progress, or, in other words, progress that is merely "more than *de minimis*." *See Endrew F.*, 580 U.S. at 402; *see also id.* at 402–03 ("When all is said and done, a student offered an educational program providing 'merely more than *de minimis*' progress from year to year can hardly be said to have been offered an education at all."). An IEP is not substantively adequate if it "affords the opportunity for only trivial advancement." *Mr. P*, 885 F.3d at 757 (quoting *Walczak*, 142 F.3d at 130).

The Court recognizes that "the question is whether the IEP is *reasonable*, not whether the [C]ourt regards it as ideal," *id.* at 741 (quoting *Endrew F.*, 580 U.S. at 399), and that the

substantive adequacy of an IEP is "precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers," *Grim*, 346 F.3d at 382. The Court's review of the administrative decisions below is therefore particularly circumscribed. Rather than imposing its own judgments about educational methodology or policy, the Court reviews the decisions below primarily to ensure that they are legally sound, logical, and supported by at least a preponderance of the evidence. The Court also examines the administrative record for "'objective evidence' indicating whether the child is likely to make progress or regress under the proposed plan." *See Walczak*, 142 F.3d at 130 (citing *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1121 (2d Cir. 1997)).

Here, Plaintiffs argue that the IEPs were substantively inadequate because S.T. made "no more than *de minimis* progress at best" during his three years at Northport Middle School, but Northport continued to offer him essentially the same IEP year after year. (*See* Pls.' Mem., Dkt. 20-2, at 1, 4.) In particular, they point out that S.T. had significant reading deficits, and they question why the CSEs failed to recommend him for specialized reading instruction. (*See id.* at 14–18.)

1. <u>S.T.'s IEPs Were Not Reasonably Calculated to Allow S.T. to Make Progress in Reading</u>

The Court begins with Plaintiffs' argument that S.T.'s IEPs were substantively inadequate because they failed to offer him specialized reading instruction. (*Id.*)

a) <u>The SRO's Determination that S.T. Did Not Require Specialized Reading Instruction Does Not Merit Deference</u>

The SRO held that S.T. did not require specialized reading instruction because he received general education reading services—AIS Reading—that adequately addressed his needs. (*See* R. at SD36–40.) However, while it is true that S.T. appears to have received AIS Reading services beginning in 7th grade, none of S.T.'s IEPs actually included AIS Reading.

(*See id.* at DE13–22 (March 2021 IEP for 8th grade), DE43–53 (April 2021 IEP for 8th grade), DE60–71 (February 2022 IEP for 9th grade), DE116–30 (July 2023 IEP for 10th grade); *see also id.* at P22 (Northport's appeal brief before the SRO acknowledging that AIS Reading "is not listed as a specialized reading class on the IEP," but arguing that that "should not serve to diminish the importance of the service that had been, and was going to continue to be[,] provided").) As the Second Circuit has made clear, an IEP "must be evaluated prospectively as of the time of its drafting," and "a deficient IEP may not be effectively rehabilitated or amended after the fact through testimony regarding services that do not appear in the IEP." *R.E.*, 694 F.3d at 185–86.

The SRO's decision erred by rehabilitating S.T.'s IEPs through retrospective evidence that S.T. received AIS Reading services when those services were not listed in the IEPs themselves. Since the SRO's conclusion on this issue rested entirely on this impermissible retrospective evidence, (*see* R. at SD39–40 (concluding that "the hearing record supports the finding that AIS [R]eading provided the student the instruction necessary to meet the student's needs")), it is not entitled to deference. The Court therefore turns to the IHO's decision.

b) <u>The IHO's Determination that S.T.'s IEPs Were Inadequate Because They Failed to Address S.T.'s Reading Needs Is Reinstated</u>

The IHO held that S.T.'s IEPs were substantively inadequate in part based on their failure to recommend specialized reading instruction or otherwise address S.T.'s reading needs. (*See id.* at I38, I42–45.) The Court has independently reviewed the administrative record and concludes that the preponderance of the evidence supports the IHO's conclusion. There can be little doubt that S.T. had special education needs with respect to reading. His IEPs themselves state as much. (*See id.* at DE46, DE63, DE122 (8th, 9th, and 10th grade IEPs all identifying reading comprehension as one of S.T.'s enumerated "academic, developmental, and functional needs").)

Additional evidence from the record confirms that S.T. struggled with reading and that he needed support in this area. For example, at the start of 8th grade, S.T. met with a 5th grade AIS Reading teacher who privately emailed the school counselor, Pellicano, "[i]t's not easy—basic reading phonics at his age . . . ." (*See id.* at PE198.) At the end of 8th grade, S.T.'s 8th grade special education teacher, Giancola, filled out a learning profile assessment for S.T. for him to participate in Winston Prep's summer program. On that form, she reported that S.T. had difficulties in all areas surveyed related to reading comprehension and decoding/encoding,[33] and stated (incorrectly, it turns out) that S.T. "will be recommended for small group specialized reading for next year," 9th grade. (*Id.* at PE70, PE73.)[34]

None of S.T.'s IEPs recommended any special education programs or related services to address his reading needs. Instead, they each included a single annual reading comprehension goal, which remained largely the same each year from 6th to 10th grade,[35] and which S.T.

[33] Specifically, she reported that S.T. only "occasionally" was able to identify the main idea of texts, distinguish between relevant and irrelevant information, self-monitor while reading, summarize a given reading, make inferences about an abstract text, or figure out unfamiliar words from context clues. (*See* R. at PE70.) He "usually" made pronunciation errors while reading aloud and exhibited difficulty reading, negatively impacting his comprehension. (*Id.*) He "occasionally" could syllabicate multisyllabic words or read at an average rate, but "rarely" demonstrated grade-level spelling. (*Id.*)

[34] Giancola testified at the hearing that she thought the level of support provided in the 9th grade IEP would be sufficient for S.T., (*see* R. at T401), but this testimony conflicts with her contemporaneous assessment of S.T.'s skills and his need for small group specialized reading, (*see id.* at PE70, PE73).

[35] For 6th grade, the IEP reading goal was that "[w]hen reading a narrative/informational text, [S.T.] will be able to support the main idea with text evidence," to be measured using "[t]eacher devised tests or worksheets," and the criteria for the goal to be achieved was "80% success over 4 weeks." (R. at PE33.) For 7th grade, the IEP reading goal was that "[w]hen presented with narrative and/or informational text from [S.T.'s] content area subjects, [S.T.] will state the theme or central idea of the text and use key details for support," to be measured using "[w]ork samples," and the criteria for the goal to be achieved was "75% success over 3 weeks." (*Id.* at PE44–45.) For 8th grade, the IEP reading goal was that "[w]hen presented with narrative

appears to have never achieved. (*See id.* at PE33, PE44–45, DE18, DE48, DE65–66, DE124 (IEP reading goals); *id.* at PE179, DE57, DE76 (7th and 8th grade IEP progress reports)[36].) The IDEA is not satisfied by an IEP that simply identifies a need and establishes a goal. The crucial part is what connects the two: the "special education and related services" that will be provided to the student to enable them to "advance appropriately toward attaining" the goal. *See* 20 U.S.C. § 1414(d)(1)(A)(i)(IV).

Northport relied on AIS Reading then, and does so again now, to fill the gap. (*See, e.g.*, Def.'s Opp'n, Dkt. 23, at 4 (arguing that "[t]he SRO appropriately determined that 'AIS [R]eading provided the student the instruction necessary to meet the student's needs when considered in the context of the student's overall educational programming'" (quoting R. at SD40)); *id.* at 5 (arguing that "the fact that [AIS classes] are part of the school district's regular

---

and/or informational text from [S.T.'s] content area subjects, [S.T.] will answer text dependent questions by providing evidence in the reading," to be measured using "[w]ork samples," and the criteria for the goal to be achieved was "3 out of 5 trials on 4 consecutive occasions." (*Id.* at DE18, DE48.) For 9th grade, the IEP reading goal was that "[w]hen presented with narrative and/or informational text from [S.T.'s] content area subjects on the a [sic] Ninth grade level, [S.T.] will cite 2 examples of strong and thorough textual evidence that supports an analysis of what the text says explicitly as well as inferences drawn from the text," to be measured using "[w]ork samples," and the criteria for the goal to be achieved was "70% success on 3 consecutive occasions." (*Id.* at DE65–66.) For 10th grade, the IEP reading goal was that "[w]hen presented with a reading assignment, [S.T.] will use close reading strategies (such as, identifying literary elements) to help analyze explicit and inferential data to present concrete evidence from the text," to be measured using "[w]ork samples," and the criteria for the goal to be achieved was "4 out of 5 trials on 2 consecutive occasions." (*Id.* at DE124.)

[36] The record does not contain S.T.'s 6th grade IEP progress report(s). The 7th and 8th grade IEP progress reports that are included in the record show that S.T. was, at times, deemed to be "[p]rogressing [s]atisfactorily" towards his reading goal—meaning that he was "making satisfactory progress and [was] expected to achieve the goal," (*see* R. at DE75 (explaining what the different progress descriptions mean))—but that is not the same as actually achieving the goal, (*see id.* (indicating that there is a separate progress description for when the student "has achieved the goal"); *see also id.* at PE179, DE57, DE76 (all IEP progress reports indicating that S.T. was "[p]rogressing [g]radually" or "[p]rogressing [s]atisfactorily" towards his reading goal, but never indicating that S.T. actually "[a]chieved" the goal)).

education program does not preclude them from meeting the definition of special education or related services and being included on the child's IEP").) That is insufficient for two reasons.

First, if Northport intended AIS Reading to provide S.T. with the specially designed instruction required by the IDEA, it needed to indicate that on S.T.'s IEPs. *See Bd. of Educ. of Uniondale Union Free Sch. Dist. v. J.P.*, No. 18-CV-1038 (JMA) (AYS), 2019 WL 4315975, at *12 (E.D.N.Y. Aug. 23, 2019) (explaining that if AIS Reading services are intended to provide specially designed instruction for a student with a disability, they must be listed in the student's IEP), *report and recommendation adopted*, 2019 WL 4933576 (E.D.N.Y. Oct. 7, 2019); *see also* N.Y. Comp. Codes R. & Regs. tit. 8, § 100.1(g) (defining AIS and explaining that while the services must be made available to students both with and without disabilities, they shall only be provided to students with disabilities "to the extent consistent with the [IEPs] developed for such student[s]"). But here, as noted above, none of S.T.'s IEPs included any reference to AIS Reading.

Second, there is no evidence in the record—let alone S.T.'s IEPs—explaining how AIS Reading was or would be specially adapted to meet S.T.'s unique reading needs. Northport did not call S.T.'s AIS Reading teacher to testify at the impartial hearing. Therefore, the preponderance of the evidence before the Court shows that AIS Reading did not constitute "specially designed instruction" in this case. *See* 34 C.F.R. § 300.39(b)(3) (defining "[s]pecially designed instruction" as "adapting the content, methodology, or delivery of instruction . . . to address the unique needs of a student with a disability that result from the student's disability"); *accord J.P.*, 2019 WL 4315975, at *12 (finding that AIS Reading constituted specially designed instruction because of hearing testimony from AIS Reading teacher stating that she "modified

the content and delivery of AIS [R]eading instruction to [the student] to address [the student's] unique needs in reading").[37]

As the IHO noted, "[i]t is unclear why a specialized reading class was never recommended" for S.T. (R. at I42.) Multiple witnesses testified at the hearing that such a class was available at Northport for students with significant reading disabilities who had not had success with other interventions. (*See id.* at T271, T276, T478–79); *see also* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.6(b)(6) (explaining that "specially designed reading instruction" is available to students with disabilities who have "significant reading difficulties that cannot be met through general reading programs"). As one witness explained, the teacher in a specialized reading class works with students individually or in small groups, and is able to differentiate the instruction depending on each student's individual needs and the goals in their IEP. (*See* R. at T480–82.) But S.T.'s CSEs apparently never even considered that option for S.T. or discussed it with his parents. (*See id.* at T277–78, T481.)[38]

In sum, while the IEPs acknowledged that S.T. needed reading support, the IEPs did not provide him with *any* tailored special education or related services to meet that need. The IDEA

---

[37] The Court is also highly skeptical of any argument that Northport enrolled S.T. in AIS Reading in order to address his unique needs. As Northport itself acknowledged in its briefing before the SRO, *all* students who do not meet state standards on the NYSTP assessments "are required to receive AIS services." (*See* R. at P22.)

[38] The only explanation in the record for why Northport never considered specialized reading for S.T. was that he was "making progress in AIS." (*See* R. at T271; *accord id.* at T486 (claiming that S.T. was "making adequate progress with the other [general education] supports").) Based on the preponderance of evidence in the record, however, the Court agrees with and defers to the IHO's determination that S.T. was not, in fact, making adequate progress in AIS Reading. (*See id.* at I42 ("[S.T.] was placed in an AIS general education reading class for [multiple] years without evidence of progress and instead evidence of continued struggle.").) In any event, S.T.'s alleged progress in AIS Reading cannot remedy the IEPs' failures to provide any special education programs or services to address S.T.'s reading needs, since the IEPs do not mention AIS at all.

requires more. Because S.T.'s IEPs were not reasonably calculated to enable him to make appropriate progress in reading, the Court agrees with the IHO that Northport denied S.T. a FAPE for his 8th, 9th, and 10th grade school years, and reinstates that portion of the IHO decision.

2. S.T.'s General Academic Program Was Not Reasonably Calculated to Allow Him to Make Appropriate Progress

The Court next addresses Plaintiffs' argument that S.T.'s academic program set forth in the IEPs was not reasonably calculated to allow him to make appropriate progress more broadly.

a) The SRO's Determination that S.T.'s IEPs Reasonably Recommended Continuing a Similar Program Each Year Does Not Merit Deference

The SRO acknowledged that the IEPs continued to recommend a "similar program" from year to year, but she found that S.T. had demonstrated progress in that program, so she concluded that it was reasonable for the IEPs to continue to recommend it. (*See id.* at SD29–34.)

However, the SRO's decision failed to grapple with evidence in the record that is highly relevant to the question of whether S.T. demonstrated objective progress. As one example, the SRO concluded that S.T. had made "some progress" during his 6th grade school year solely based on comments from his teachers reflected in his 7th grade IEP[39] and its accompanying PWN. (*See* R. at SD27.)[40] But there was other evidence weighing against that conclusion. Of

[39] While the adequacy of the 7th grade IEP is not directly challenged in this case, it is relevant because the SRO found that S.T.'s 8th, 9th, and 10th grade IEPs were adequate specifically because they recommended a similar program to S.T.'s IEPs from previous years, starting with 6th grade, under which the SRO believed S.T. had made progress. (*See* R. at SD27, SD29, SD32, SD33–34.)

[40] The Court notes that even the SRO's summary of the IEP and PWN reveals that the evidence of progress contained in those documents was mixed at best. (*See* R. at SD27.) While S.T.'s general and special education teachers told the CSE that S.T. had made some

particular note are S.T.'s NWEA test results from the fall and winter of 6th grade, which showed that he was not on track to meet state proficiency standards,[41] and that his proficiency score did not increase in English/Reading and actually *decreased* in Math. (*See id.* at PE42, PE214.) S.T.'s CSE had access to these test scores, (*see id.* at PE40, PE42 (7th grade IEP showing NWEA assessment scores in "evaluation results" section)), but the SRO's decision ignores this probative and objective evidence when discussing S.T.'s 6th grade progress and the suitability of S.T.'s 7th grade academic placements, (*see generally id.* at SD26–27).

Similarly, the SRO's discussion of S.T.'s academic progress in subsequent years does not reference S.T.'s 7th and 8th grade end-of-year test scores from the NYSTP, which showed that he did not meet state standards at any point in any of the subject areas tested and was "well below proficient" in some. (*See id.* at PE67–68, PE214.) Nor does it reference S.T.'s "Reading Plus" assessments from his 8th grade AIS Reading program, which showed that his overall reading proficiency was at a 3rd grade level (3.3) when he began 8th grade, rose to a 4th grade level (4.3) mid-way through the year, but then stagnated (and even decreased slightly) by the end of the year (4.2). (*Id.* at PE205.)[42]

Again, the SRO should have, at minimum, discussed this evidence when explaining why she nonetheless concluded that S.T. was adequately progressing. *See C.L. v. N.Y.C. Dep't of Educ.*, No. 12-CV-1676 (JSR), 2013 WL 93361, at *7 (S.D.N.Y. Jan. 3, 2013) (finding the

"improvement[s]," they did so while discussing his continued struggles and academic deficits. (*See id.* at SD27, PE50–51.)

[41] *See* NWEA Psychometric Sols., *supra*, at 21, 24 (showing that a student with S.T.'s scores would have less than a 1% chance of meeting the state's proficiency standards in 6th grade).

[42] *See also infra* n.46 (compiling other evidence, including objective evidence, weighing against the SRO's finding that S.T. was making progress).

SRO's decision merited no deference based on the "critical fact" that the SRO "did not grapple with contrary evidence and gave no explanation" for why it credited certain testimony over other contrary evidence), *aff'd*, 552 F. App'x 81 (2d Cir. 2014); *see also M.H.*, 685 F.3d at 252 (holding that the SRO's failure to "consider highly significant evidence in the record" rendered the SRO decision "precisely the type of determination to which courts need not defer").

Moreover, the SRO functionally applied the wrong legal standard. She determined that S.T.'s IEPs were reasonable because they were based on prior programs that produced "some" progress. (*See* R. at SD27, SD32.) But the question is whether the IEPs were "reasonably calculated to enable [S.T.] to make progress that is appropriate in light of [his] circumstances." *Endrew F.*, 580 U.S. at 399, 402–03; *see id.* at 397, 404 (rejecting the Tenth Circuit's standard, which was that an IEP was sufficient if it was reasonably calculated to enable the student to make "*some* progress" (citation omitted)).[43] The SRO's decision never explains why it was appropriate, based on S.T.'s unique circumstances, for him to achieve only "some" progress year after year. (*See generally* R. at SD26–34.) The phrase "some" progress is also vague, as it could describe any degree of progress ranging from *de minimis* to fully appropriate.

Since the SRO's decision disregarded relevant evidence without explanation and failed to apply the correct legal standard, it is neither "well-reasoned" nor "based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *M.H.*, 685 F.3d at 244.[44] The Court therefore turns to the IHO's decision.

---

[43] Northport defends the SRO's reasoning by pointing out that the SRO decision "cited to the Supreme Court's decision in *Endrew F.* . . . on multiple occasions in its decision" within the "Applicable Standards" section. (Def.'s Reply, Dkt. 22-6, at 2.) The problem, however, is that the SRO's decision failed to *apply* this standard.

[44] The Court further notes that the SRO never reached an actual conclusion with regard to the adequacy of the academic program for S.T.'s 10th grade (2023–24) school year. Although

b) The IHO's Determination that S.T.'s 8th, 9th, and 10th Grade IEPs Were Substantively Inadequate Is Reinstated

The IHO found that S.T.'s 8th, 9th, and 10th grade IEPs were substantively inadequate. (*See* R. at I37–45.) The IHO's determination did not rest solely on subjective (and mixed) teacher reports about S.T.'s progress, but also considered S.T.'s grades, cognitive evaluations, NYSTP test scores, Reading Plus assessments, and Dr. Skinner's report, among other things. (*See id.*); *cf. Khanimova v. Samuels*, No. 25-808-CV, 2026 WL 456507, at *3 (2d Cir. Feb. 18, 2026) (summary order) (in discussion of whether private placement was appropriate, explaining that subjective testimony about the student's progress does not constitute the "objective evidence of progress that is preferable under the law of this Circuit," such as progress reports, grades, and test scores (internal quotation marks and citations omitted)). The IHO concluded that neither ICT classes nor general education supports like AIS had provided S.T. with educational benefits or allowed him to make meaningful progress at Northport. (*See* R. at I39, I41–44.) She therefore held that Northport had denied S.T. a FAPE for his 8th, 9th, and 10th grade years by continuing to offer him an academic program that was not reasonably calculated to enable him to make appropriate progress. (*See id.* at I37–45.)

the SRO stated that Northport "did not deny [S.T.] a FAPE for the three school years at issue," (R. at SD27), her explanation for this conclusion with respect to S.T.'s 10th grade year was simply that "the hearing record included *sufficient explanation of the information relied on* at the July 2023 CSE meeting in making recommendations for ICT services and programming to support [S.T.] for his 2023–24 [10th grade] school year," (*id.* at SD34 (emphasis added); *see also id.* (noting that "the CSE considered information from [S.T.]'s previous IEP, documentation [from] the student's private school, and the June 2023 private evaluation")). However, the fact that the CSE might have relied on sufficient information in making its recommendations does not answer the question of whether the IEP provided a substantively adequate academic program for S.T., nor does it support the SRO's conclusion that the IEP was substantively adequate. Indeed, the SRO decision itself had already discussed the "[s]ufficiency of [e]valuative [i]nformation" at length in a different section. (*See id.* at SD12–22.)

The Court finds the IHO's decision to be legally sound and supported by the evidence. While there are indications that S.T. made *some* progress in Northport's recommended program,[45] there is also an abundance of evidence that his progress was either non-existent, *de minimis*, or otherwise inappropriate in light of S.T.'s capabilities.[46] The Court finds no error in

---

[45] Namely: (1) statements made by S.T.'s teachers during the CSE meetings indicating that he was making some progress or doing well, (*see, e.g.*, R. at PE50 (PWN for 7th grade IEP stating that S.T.'s teacher reported that his 6th grade "academic performance [could] be inconsistent and he [was] not always prepared for class/texts *although improvement was noted*" (emphasis added)); *id.* at DE72 (PWN for 9th grade IEP stating that S.T.'s 8th grade teachers reported that he was "doing well" in Math, Spanish, and Science, but still "struggl[ing]" with English and with staying focused on his computer)); (2) Northport teacher and counselor testimony at the impartial hearing that S.T. generally made progress in his academic program, (*see, e.g.*, *id.* at T207 (Girardin testifying that S.T. "was making progress in the integrated co-teaching class[es] in eighth grade")); (3) S.T.'s October 2020 performance on the Woodcock-Johnson IV Tests of Achievement (during the fall of his 7th grade year), which classified him in the "average" range for most subjects tested, but placed him in the "low average" range for broad reading, academic fluency, sentence reading fluency, and sentence writing fluency, (*see id.* at DE11); (4) IEP progress reports indicating that S.T. was progressing towards his IEP goals, although he still did not achieve many of them, (*see, e.g.*, *id.* at DE76–77 (8th grade IEP progress report stating that S.T. had achieved his IEP goals in the categories of study skills, mathematics, and social/emotional/behavioral skills, but had not achieved his goals in reading, writing, or speech/language)); and (5) S.T.'s grades, which showed that he had passed most (but not all) of his classes, (*see, e.g.*, *id.* at DE59 (final report card from 7th grade showing that S.T. had passed most of his classes but had failed Italian in the first quarter and was removed from the class); *but see id.* at T791–92, T796 (C.T. testifying that she believed Northport was artificially inflating S.T.'s grades by dropping missing assignments rather than making S.T. complete them and that S.T. should have failed additional classes)).

[46] This evidence includes, but is not limited to: (1) S.T.'s NYSTP test results, which showed that he failed to meet state proficiency standards in any of the areas tested in both 7th and 8th grade, (*see* R. at PE214, PE67–69); (2) S.T.'s scores on the Wechsler Intelligence Scale for Children – Fifth Edition, which revealed a drop in S.T.'s full scale IQ score from a 102 in 2018 (before he started at Northport) to a 95 in 2020 (7th grade), "resulting from decreases in his verbal comprehension and processing speed," (*id.* at I10; *see also id.* at DE4–10); (3) S.T.'s Reading Plus test results, which showed that S.T. was reading at a 4th grade level at the end of 8th grade and also showed that his reading proficiency score had not increased (and, in fact, had decreased) over the course of the spring of his 8th grade year, (*see id.* at PE205); (4) S.T.'s NWEA test scores, particularly in English/Reading, which did not change between the fall and winter of 6th grade (190), increased by the fall of 8th grade (208), but dropped precipitously to below his 6th grade level in the winter of 8th grade (177), (*see id.* at PE214); (5) the fact that S.T. failed several classes in 7th and 8th grade and that his grades largely dropped over the

the IHO's weighing of the conflicting evidence. And based on an independent review of the record, the Court agrees that the objective evidence weighs more heavily towards the conclusion that S.T. did not make meaningful progress in the academic program he was provided at Northport between 6th and 8th grade. *See supra* n.46 (compiling evidence showing that S.T. was not making progress in the academic program provided by his IEPs at Northport); *see also Cerra*, 427 F.3d at 195 (explaining that a district court "must examine the record for any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan" (citation modified)); *Walczak*, 142 F.3d at 130 (same).

The Court also finds no error in the IHO's conclusion that the degree of S.T.'s progress (if any) was insufficient to justify offering him virtually the same academic program each year. *See M.H.*, 685 F.3d at 256 ("[I]f the student made no progress under a particular IEP in a particular year, the propriety of an identical IEP in the next year may be questionable." (citation modified)); *R.N. v. Bd. of Educ. for Iroquois Cent. Sch. Dist.*, No. 14-CV-0211 (LJV), 2016 WL 11607329, at *16 (W.D.N.Y. Nov. 15, 2016) ("[I]f a student has failed to make any progress under an IEP in one year, a court would be hard pressed to understand how the subsequent year's IEP, if simply a copy of that which failed to produce any gains in a prior year, could be appropriate." (citation and internal quotation marks omitted)), *report and recommendation adopted*, 2019 WL 2170758 (W.D.N.Y. May 20, 2019), *aff'd sub nom. A.N. v. Bd. of Educ. for*

course of his 8th grade year, (*see id.* at DE59, DE78); (6) Dr. Skinner's hearing testimony that S.T.'s grades and progress reports from Northport revealed "under[]achievement specifically for a student who has an age typical cognitive profile," (*id.* at T619); and (7) contemporary teacher reports indicating that S.T. was struggling, (*see, e.g.*, *id.* at PE186 (progress report from 7th grade with comments including "INCONSISTENT PERFORMANCE," "INAPPROPRIATE CLASS BEHAVIOR," "INCONSISTENT EFFORT," "IRRESPONSIBLE USE OF SUPPLIES," "ASSIGNMENTS INCOMPLETE AND/OR MISSING," and "DIFFICULTY STAYING ON TASK"); *id.* at PE198 (email from beginning of 8th grade from teacher privately writing to counselor that "[i]t's not easy—basic reading phonics at his age . . .")).

*Iroquois Cent. Sch. Dist.*, 801 F. App'x 35 (2d Cir. 2020). The Court therefore reinstates the IHO's determination that S.T.'s 8th, 9th, and 10th grade IEPs were substantively inadequate.[47]

* * *

As set forth above, the SRO's decision was not well-reasoned: it did not competently apply the law to the facts, it relied on impermissible retrospective evidence, and it ignored relevant evidence in the record without explanation. The IHO's decision is better-reasoned and supported by the preponderance of the evidence. The Court therefore reinstates the IHO's determination that Northport denied S.T. a FAPE for the 8th, 9th, and 10th grade school years. This conclusion rests on multiple IDEA violations, any one of which would have independently denied S.T. a FAPE: (1) the procedural inadequacy of S.T.'s IEPs due to the failure to conduct an FBA or otherwise address his behavioral issues; (2) the substantive inadequacy of S.T.'s IEPs due to their failure to provide special education or related services to address S.T.'s reading needs; and (3) the substantive inadequacy of S.T.'s IEPs due to their broader failure to

[47] The Court also rejects Northport's seeming suggestion that ICT classes were appropriate for S.T. in part because the more restrictive special education option available at Northport—a smaller class with only students who have disabilities—would *not* have been appropriate for him. (*See, e.g.*, Def.'s Opp'n, Dkt. 23, at 14–15 (arguing that ICT classes were appropriate for S.T. because he "deserved to be grouped with students who did not have significant cognitive and academic delays," which would not have been the situation in the smaller self-contained class).) The fact that another option would have been *less* appropriate does not bear on whether the first option is appropriate. *See E.H.*, 164 F. Supp. 3d at 552–53 ("The IDEA does not demand that students with special needs be placed in the best of inappropriate public options. The IDEA demands an *appropriate* education be offered."); *see also S.Y. v. N.Y.C. Dep't of Educ.*, 210 F. Supp. 3d 556, 573 (S.D.N.Y. 2016) (explaining that if the public school district does not have appropriate programming for a particular student, the CSE should concede that its public options are unable to meet the student's needs (citing *E.H.*, 164 F. Supp. 3d at 551–53)).

recommend an educational program that was reasonably calculated to enable him to make appropriate progress.[48]

## II. *Burlington/Carter* Step Two: Appropriateness of Private Placement

The second *Burlington/Carter* step asks whether Plaintiffs' private placement at Winston Prep was appropriate. Plaintiffs "bear the burden of establishing the appropriateness of their private placement." *R.E.*, 694 F.3d at 185; *accord* N.Y. Educ. Law § 4404(1)(c) ("[A] parent . . . seeking tuition reimbursement for a unilateral parental placement shall have the burden of persuasion and burden of production on the appropriateness of such placement.").

"A private placement is appropriate if it is 'reasonably calculated to enable the child to receive educational benefits,' 'such that the placement is likely to produce progress, not regression.'" *T.K. v. N.Y.C. Dep't of Educ.*, 810 F.3d 869, 877 (2d Cir. 2016) (internal citation omitted) (first quoting *C.F.*, 746 F.3d at 82; and then quoting *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 836 (2d Cir. 2014)). "Progress may be demonstrated by grades, test scores, regular advancement, or other objective evidence, but no single factor is dispositive as 'courts assessing the propriety of a unilateral placement [must] consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs.'" *C.L.*, 744 F.3d at 836 (alteration in original) (quoting *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364 (2d Cir. 2006)). "An inquiry into the appropriateness of a private placement is thus a search for indicators that the placement provides educational instruction specially designed to meet the

---

[48] Given these holdings, the Court does not specifically address Plaintiffs' argument that Northport denied S.T. a FAPE by failing to provide Autism-specific programming. (*See* Pls.' Mem., Dkt. 20-2, at 24–26.) In any event, that argument overlaps substantially with the argument that S.T.'s general academic program was not reasonably calculated to enable him to make appropriate progress. (*See id.*)

unique needs of a [child with a disability], supported by such services as are necessary to permit the child to benefit from instruction." *Id.* (citation modified) (citing *Frank G.*, 459 F.3d at 365).

In general, "the same considerations and criteria that apply when determining whether the [public school district's] placement is appropriate should be considered in determining the appropriateness of the parents' [private] placement." *C.F.*, 746 F.3d at 82 (quoting *Frank G.*, 459 F.3d at 364). However, "parents are not barred from reimbursement where a private school they choose does not meet the IDEA definition of a free appropriate public education." *Frank G.*, 459 F.3d at 364 (citing 20 U.S.C. § 1401(9)). Nor does an appropriate private placement need to "meet state education standards or requirements," such as by providing certified special education teachers or creating an IEP for the student. *Id.* (citing *Carter*, 510 U.S. at 14).

Here, the SRO did not reach the issue of whether Winston Prep was an appropriate private placement for S.T. (*See* R. at SD40.) Therefore, the Court must defer to the IHO's decision as long as it is well-reasoned and supported by the evidence. *See C.F.*, 746 F.3d at 82 (deferring to the IHO opinion because the SRO did not reach the issue of whether the parents' private placement was appropriate (citing *M.H.*, 685 F.3d at 252)).

1. <u>The IHO's Determination that S.T.'s Private Placement Was Appropriate Merits Deference</u>

The IHO concluded that Winston Prep "provided [S.T.] with the supports, services[,] and interventions that he required in order to make meaningful progress" and addressed "all areas of [S.T.'s] educational, social[,] and emotional needs." (R. at I53.) She relied primarily on the testimony of Keith Oncale, the head of school at Winston Prep, who explained how Winston Prep addressed S.T.'s unique educational needs[49] and described the progress that S.T. had made

[49] Oncale described how Winston Prep tailors its program to meet the needs of each student. (*See, e.g.*, R. at T654–55 (explaining that Winston Prep continually "redesign[s] the

in the program. (*See generally id.* at I48–53.) The IHO also cited C.T.'s testimony that S.T. had made progress at Winston Prep. (*See id.* at I53.)

The IHO's decision merits deference. Oncale's testimony, along with corroborating documents in the record, (*see, e.g.*, *id.* at PE132–59 (Winston Prep progress reports detailing how each teacher addressed S.T.'s needs and how S.T. was progressing)), clearly demonstrate that Winston Prep provided S.T. with the requisite "educational instruction specially designed to meet [S.T.'s] unique needs." *See Frank G.*, 459 F.3d at 365 (quoting *Rowley*, 458 U.S. at 188–89); *see also W.A. v. Hendrick Hudson Cent. Sch. Dist.*, 927 F.3d 126, 147 (2d Cir. 2019) ("[T]he question of whether a private school placement provided special education services is precisely a question on which [the courts] defer to educational experts." (citing *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 451–52 (2d Cir. 2015))).

The record also supports the IHO's determination that S.T. made significant progress at Winston Prep. (*See* R. at I53 (finding that S.T. had "made progress in his academic, social[,] and emotional skills").) In addition to the testimony cited in the IHO's decision, (*see id.* (discussing Oncale's and C.T.'s descriptions of S.T.'s progress)), there is objective evidence of progress. For instance, S.T.'s reading level at the end of 8th grade at Northport Middle School was at the 4.5 grade level in comprehension and the 7.5 grade level in vocabulary. (*See id.* at PE205,

---

program to fit the needs of [each] student"); *id.* at T657 (explaining that the program aims to identify "gaps" in each student's skills and "com[e] up with proven methodologies that address that particular skill").) Specifically with respect to S.T., Oncale testified about how Winston Prep addressed S.T.'s behavioral difficulties, such as by providing constant positive reinforcement throughout the day, slowing down the pace of lessons and making directions concrete so S.T. could follow them rather than shutting down, and limiting S.T.'s computer use. (*See id.* at T673–74, T689, T706–07, T718.) He also testified about how Winston Prep addressed S.T.'s slower processing speed, (*see id.* at T668–69, T718), executive functioning needs, (*see id.* at T688–89), encoding and decoding deficits, (*see id.* at T704–05), and reciprocal conversation skills, (*see id.* at T685–86, T692–94).

PE207.) But after finishing his 9th grade year at Winston Prep, S.T.'s reading was at the 8.9 grade level in comprehension and the 10.0 grade level in vocabulary. (*See id.* at PE163, DE117.) While these scores came from two different tests (the 8th grade scores were from a Reading Plus assessment, and the 9th grade scores were from a Gates-MacGinitie assessment) and are therefore not directly comparable, it is remarkable for S.T. to have scored at his grade level on *any* reading assessment given his persistent difficulties with reading at Northport. The fact that he was able to do so after only one year at Winston Prep strongly suggests that Winston Prep's academic program was "reasonably calculated to enable [S.T.] to receive educational benefits." *See T.K.*, 810 F.3d at 877.

Finally, the Court notes that S.T.'s continued placement at Winston Prep for 10th grade was informed by the advice of a licensed private psychologist, Dr. Skinner. Dr. Skinner's comprehensive evaluation report, produced while S.T. was in 9th grade, advised Plaintiffs that S.T.'s disability "significantly impact[s] his learning needs to an extent that necessitates specialized instruction," including "a small, structured classroom setting" with "[i]ndividually modified instruction and opportunities for 1:1 assistance." (*See* R. at PE99–100.) Dr. Skinner testified that the program at Winston Prep satisfies her recommendations, (*see id.* at T563), which is further evidence that Winston Prep was an appropriate placement for S.T. *See T.K.*, 810 F.3d at 878 (approving of private placement that matched the recommendations of a private psychologist).

2. <u>Northport's Arguments Are Unavailing</u>

Northport's arguments for why Winston Prep is not an appropriate placement are unpersuasive. First, Northport argues that Winston Prep is inappropriate because it is "not the least restrictive environment for S.T.," meaning that S.T. would be educated alongside peers without disabilities to a greater extent had he attended Northport High School for 9th and 10th

grade. (*See* Def.'s Mem., Dkt. 22-4, at 15); *see also* 20 U.S.C. § 1412(a)(5)(A) (IDEA's "[l]east restrictive environment" requirement stating that, "[t]o the maximum extent appropriate, children with disabilities . . . [must be] educated with children [without disabilities]"). However, the IDEA's requirement that students be educated in the "least restrictive environment" is "aimed at preventing *schools* from segregating [students with disabilities] from the general student body, but not necessarily to restrict *parental* options when the public schools fail to comply with the requirements of the IDEA." *C.L.*, 744 F.3d at 837 (citation modified). And "parents whose children are denied a FAPE may be and often are forced to turn to specialized private schools that educate only [children with disabilities]." *Id.* Thus, while restrictiveness is a factor bearing on whether a private placement is appropriate, "by no means is it dispositive." *Id.* Where, as here, the public school system "denied the child a FAPE, the restrictiveness of the private placement cannot be measured against the restrictiveness of the public school option." *Id.* Therefore, the Court cannot and does not conclude that Winston Prep is inappropriate merely because Northport would have been a less restrictive alternative.

Second, Northport argues that Winston Prep is not appropriate because it does not have social workers or psychologists on staff and S.T. is not receiving speech and language services there. (*See* Def.'s Mem., Dkt. 22-4, at 15–16.) However, Plaintiffs do not need to show that Winston Prep "furnishes every special service necessary to maximize [S.T.'s] potential." *See Frank G.*, 459 F.3d at 365; *see also T.K.*, 810 F.3d at 878 (rejecting notion that "the failure [of a private school] to include multiple services that were properly recommended in an IEP necessarily renders a private placement inappropriate"). The question is whether the private placement adequately addresses the student's needs in order to enable them to receive educational benefits. *See T.K.*, 810 F.3d at 878 (citing *Frank G.*, 459 F.3d at 364–65). Here,

Oncale testified that Winston Prep is able to meet S.T.'s social and emotional needs despite not having a licensed social worker or psychologist on staff. As he noted, Winston Prep has a licensed *school* psychologist on staff,[50] and S.T. discusses his feelings and other social-emotional concerns with his Focus teacher, who is a licensed art therapist, every day. (*See* R. at T742–43.) Oncale also testified that speech-language services are embedded throughout the entire curriculum at the direction of an on-staff speech pathologist. (*See id.* at T725–26.) The Court agrees with Plaintiffs and the IHO that these services are sufficient to address S.T.'s needs and enable him to make academic progress.

Third, Northport points out that "many of the teachers at Winston [Prep] are not certified to teach in New York State." (Def.'s Mem., Dkt. 22-4, at 16–17.) But as Northport acknowledges, "the lack of certification for many of the staff at Winston [Prep] does not, in and of itself, render the program inappropriate"; rather, Northport contends that this factor shows that the program is inappropriate when "combined with some of the other noted deficiencies in the program." (*Id.* at 17.) Since the Court does not agree that the program is otherwise deficient, the Court does not address this argument further, except to note that Oncale's testimony establishes that S.T.'s teachers at Winston Prep are highly credentialed and qualified. (*See* R. at T695–702.)

Altogether, Plaintiffs' decision to place S.T. at Winston Prep was reasonably calculated to enable him to receive educational benefits. Plaintiffs have therefore met their burden of showing that Winson Prep was an appropriate private placement at step two of the *Burlington/Carter* test.

---

[50] It is unclear from the record how a "school psychologist" differs from a "psychologist."

## III. ***Burlington/Carter*** Step Three: Balance of the Equities

The third *Burlington/Carter* prong asks whether the equities support reimbursement and, if so, how much. *See Ferreira*, 120 F.4th at 330; *see also* 20 U.S.C. § 1412(a)(10)(C)(iii)(III) (providing that "[t]he cost of reimbursement . . . may be reduced or denied . . . upon a judicial finding of unreasonableness with respect to actions taken by the parents"). The Court has broad discretion at this step and does not need to defer to the administrative determinations below. *See Ferreira*, 120 F.4th at 330, 332–33. Among the relevant factors are (1) whether "the cost of the private education was unreasonable," *id.* at 330 (quoting *Carter*, 510 U.S. at 16); (2) whether the parents "unilaterally arrange[d] for private educational services without ever notifying the school board of their dissatisfaction with their child's IEP," *id.* (first quoting *M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 68 (2d Cir. 2000); and then citing 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(aa)–(bb)); and (3) "whether the parents obstructed or were uncooperative in the school district's efforts to meet its obligations under the IDEA," *id.* (quoting *C.L.*, 744 F.3d at 840).

Here, Northport does not make any argument related to the equities. (*See generally* Def.'s Mem., Dkt. 22-4 (addressing only the first two *Burlington/Carter* prongs); Def.'s Reply, Dkt. 22-6 (same); Def.'s Opp'n, Dkt. 23 (addressing only the first *Burlington/Carter* prong).) And the Court does not independently find any equitable reason to deny or reduce Plaintiffs' request for tuition reimbursement. "The record does not show any obstruction or intransigence to participate in the [IDEA] process on the part of the [p]arent that would justify finding reimbursement inequitable." *See E.H.*, 164 F. Supp. 3d at 558. C.T. promptly informed Northport of her dissatisfaction with S.T.'s IEPs and her decision to reject them. (*See, e.g.*, R. at T806–07 (C.T. testifying that she "absolutely" expressed her strong disagreement with the CSE's recommendation to remove S.T.'s Resource Room for 9th grade); *see also id.* at PE76, PE116

(C.T.'s emails notifying Northport of her disagreement with and rejection of S.T.'s 9th and 10th grade IEPs).) Moreover, "it cannot be said that [C.T.'s] years-long cooperation with the CSE[s] was merely a 'sham' to get tuition reimbursement." *See R.N.*, 2016 WL 11607329, at *23 (citations omitted). The third *Burlington/Carter* prong therefore weighs in Plaintiffs' favor.

**CONCLUSION**

After carefully reviewing the administrative record and the state administrative determinations below, the Court finds the SRO's decision unsupportable. The IHO's decision is better-reasoned and entitled to deference on matters of educational policy. Applying that deference, the Court agrees that Plaintiffs have carried their burden of showing that Northport failed to offer S.T. a FAPE for the 2021–22, 2022–23, and 2023–24 school years. Plaintiffs have also shown that Winston Prep was an appropriate placement for S.T. There are no equitable factors obligating the Court to deny or reduce Plaintiffs' request for tuition reimbursement.

Accordingly, Plaintiffs' motion for judgment on the administrative record is granted and Northport's cross-motion is denied. The SRO's decision (SRO No. 24-383) is vacated and the IHO's decision (IHO No. 610251) is reinstated, along with the relief ordered therein. The Clerk of Court is respectfully directed to enter judgment accordingly and close this case.

The Court directs the parties to confer regarding Plaintiffs' request for attorneys' fees and costs pursuant to 20 U.S.C. § 1415(i)(3)(B). If they are unable to reach an agreement, they shall, no later than fourteen (14) days from the date of this Memorandum & Order, submit a joint letter with a proposed briefing schedule on that issue.

The Court will file this Memorandum & Order on a restricted basis to allow the parties seven (7) days to object to any portion they believe should remain restricted, i.e., redacted. If no such objections are timely filed, the Memorandum & Order will be made public in its entirety.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 28, 2026
Brooklyn, New York

## APPENDIX

### Glossary of Acronyms

| *Acronym* | *Definition* |
|---|---|
| **AIS** | Academic Intervention Services, *see* N.Y. Comp. Codes R. & Regs. tit. 8, § 100.1(g) |
| **BIP** | Behavioral Intervention Plan, *see* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(mmm) |
| **C.T.** | Plaintiff and mother of S.T. |
| **CSE** | Committee on Special Education, *see* N.Y. Educ. Law § 4402(1)(b)(1) |
| **DCT** | Direct Consultant Teacher Services, *see* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(m) |
| **ELA** | English Language Arts |
| **FAPE** | Free Appropriate Public Education, *see* 20 U.S.C. § 1412(a)(1)(A) |
| **FBA** | Functional Behavioral Assessment, *see* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(r) |
| **ICT** | Integrated Co-Teaching, *see* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.6(g) |
| **IDEA** | Individuals with Disabilities in Education Act, 20 U.S.C. §§ 1400–82 |
| **IDEIA** | Individuals with Disabilities Education Improvement Act, Pub. L. No. 108-446, 118 Stat. 2647 |
| **IEP** | Individualized Education Program, *see* 20 U.S.C. § 1414(d) |
| **IHO** | Impartial Hearing Officer, *see* 20 U.S.C. § 1415(f); N.Y. Educ. Law § 4404(1) |
| **Northport** | Northport-East Northport Union Free School District |
| **NWEA** | Northwest Evaluation Association Assessments |
| **NYSTP** | New York State Testing Program |
| **PWN** | Prior Written Notice, *see* 34 C.F.R. § 300.503 |
| **S.T.** | Plaintiff and son of C.T. |
| **SRO** | State Review Officer, *see* 20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(2) |
| **Winston Prep** | Winston Preparatory School, Long Island Campus |